UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

───────────────────────────────────────────────────────

BENETRIA McGOWAN and
      JARRETT ENGLISH,
                 Plaintiffs,

v.                                                 Case No. 19-cv-781-BHL

CITY OF MILWAUKEE, et al.,
                 Defendants.

───────────────────────────────────────────────────────

**PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

───────────────────────────────────────────────────────

Pursuant to Fed. R. Civ. P. 56 and Civil L.R. 56(b)(1)(A), Plaintiffs Jarrett English and Benetria McGowan submit this brief in support of their motion for partial summary judgment to hold Defendants, six current and former members of the Milwaukee Police Department[1] and the City of Milwaukee, liable for false arrest, for excessive use of force, and for violations of their rights to freedom of association and expression. Plaintiffs also seek an order declaring the Defendant City of Milwaukee ("City") liable for its policy, adopted by its final policy makers, of ordering dispersal of groups of people that did not satisfy the definition of an unlawful assembly and arresting those who failed to disperse. Plaintiffs request a trial on other issues, including damages and injunctive relief, as well as on the existence of a widespread practice or custom of using unlawful dispersal orders to suppress mass First Amendment activity.

─────────────────

[1] Those members include former Assistant Chief James Harpole on all claims. Regarding Plaintiff McGowan's claims, they also include Officers Rebecca Wallich (then known as Rebecca Rodriguez), Nesrodene Ghassoul and Brian Laroque. Regarding Plaintiff English's claims, they also include Ghassoul, Sergeant Raymond Brock, and Officer Andrew Wilkiewicz.

## INTRODUCTION

Plaintiffs seek relief for violations of their First and Fourth Amendment rights during a Milwaukee Police Department ("MPD") operation on the evening of August 30, 2016, in Milwaukee's Sherman Park neighborhood. Edward Flynn, the City's police chief at the time, decided to crack down on people who had been assembling for more than two weeks to grieve over and protest MPD's shooting of a Black man on August 13, 2016. MPD's operation was designed to clear the neighborhood of protesters and mourners by issuing unjustified dispersal orders and indiscriminately arresting those who did not immediately and unquestioningly obey. McGowan was seeking to engage in the protected activity of praying for peace and was arrested 22 seconds after questioning an officer's unexplained and unjustified command to leave. English was engaged in the constitutionally protected activity of observing and recording the police operation, was in the presence of elected officials engaging their constituents in discussion about police-community relations, and was arrested as he was walking away less than one minute after an order to disperse. McGowan and English engaged in no unlawful activity, but MPD swept them up in this operation and arrested them without probable cause.

These arrests violated the First Amendment by suppressing Plaintiffs' perfectly legal associational and expressive activities. The arrests violated the Fourth Amendment right to freedom from false arrest because Defendants lacked individualized probable cause to believe Plaintiffs were engaging in or had been engaged in illegal activity. Because any amount of force used in an unlawful arrest is excessive, Defendants also violated Plaintiffs' Fourth Amendment right to be free from excessive use of force. Finally, because the Defendant officers acted pursuant to the directives of "final policy-makers" of the City of Milwaukee, the City of Milwaukee is directly liable to Plaintiffs for the deprivations of their Constitutional rights. As explained more

2

fully below, Plaintiffs are entitled to partial summary judgment on these issues.

<h2 style="text-align:center">STATEMENT OF UNDISPUTED FACTS</h2>

On August 13, 2016, in Milwaukee's Sherman Park neighborhood, an MPD officer shot and killed Sylville Smith, a Black man, who was fleeing after a traffic stop. (PFOF ¶ 1.) That night, as news of the shooting spread, people gathered in the Sherman Park area to mourn Smith's death and protest police violence against Black people. (PFOF ¶ 2.) Although the protests and mourning were largely peaceful, some individuals in the area that night also engaged in dangerous and illegal behavior. (PFOF ¶ 3.)

After the first two or three days and nights of protests, however, the large-scale illegal activity abated. (PFOF ¶ 4.) Mourners and protesters created a memorial of balloons and other items on a street tree along West Auer Avenue between North Sherman Boulevard (equivalent to North 43rd Street) and North 44th Street, near the location of the shooting. (PFOF ¶ 5.) This memorial became a daily gathering place for mourners and protesters. (PFOF ¶ 6.) While there were some complaints from neighbors about noise, public drinking and other "disorderly" behavior by some people who came to the memorial in the evenings, other people who gathered did not engage in such behavior. (PFOF ¶ 7.) In any event, after the first day or two there was no rioting, violence or other physically destructive behavior at that location. (PFOF ¶ 8.) And there was no curfew in effect after the first nights of protest. (PFOF ¶ 9.) Police made some arrests in the area, but generally allowed the mourning and protest at the memorial to continue. (PFOF ¶ 10.) With the knowledge and consent of police command staff, some elected officials and community leaders played a role in facilitating the expressive activity of those mourning and protesting, while also mediating conflicts with residents of the homes near the memorial. (PFOF ¶ 11.)

However, on August 24, 2020, Flynn emailed Patrick Curley, the Milwaukee Mayor's

3

Chief of Staff, and copied Defendant (then Assistant Chief) James Harpole. Flynn indicated that MPD's approach would soon change, stating that MPD would "not permit any return to the vigil on Friday evening after the funeral and repast. . . . A two week mourning period will be deemed enough at that location." (PFOF ¶ 12.) Flynn appeared to be responding, in part, to an email from a legislative assistant to Milwaukee Alderperson Khalif Rainey raising concerns about a shooting in the neighborhood the previous day and stating, "We now need to find a way to disperse all individuals from the 44th and Auer area." (PFOF ¶¶ 13.) Flynn had earlier received this email, which was forwarded to him by Harpole. (PFOF ¶¶ 14.)

On August 30, 2016, Rainey's aide sent another email to Flynn, noting complaints from neighbors and acknowledging that it was a "delicate process" to "be respectful to the individuals gathering and the residents," but ultimately asking that police "do what needs to be done to restore this neighborhood to its originally [sic] glory." (PFOF ¶¶ 15.) Shortly after 5 p.m., Flynn forwarded this email to Harpole with a directive to "restore order" to the neighborhood, including by making arrests "if lawful directives are defied." (PFOF ¶¶ 16.)[2] Other than the emails from Rainey and Flynn, nothing distinguished August 30, 2020, from any other evening during the prior two weeks. (PFOF ¶ 20.)

Harpole communicated with other command staff to quickly devise a plan to "restore order" that evening by "clear[ing] the area around the memorial" and "remov[ing] the individuals from the memorial at the tree." (PFOF ¶ 21.) By 6:10 p.m., a "special assignment" bulletin went out over police radio calling all available squads to respond to a "command post" at Capitol Drive

---

[2] Chief Flynn had final decision-making authority over the August 30, 2016 operation. He did not need permission from the Common Council or the Fire and Police Commission to issue the directive to restore order to the neighborhood. (PFOF ¶ 17.) As to operational planning, Defendant Harpole had the "highest level of direct supervision" regarding the deployment, with Inspector Basting making on-the-ground decisions about its execution. (PFOF ¶ 19.)

4

and 56th Street, where a "rushed" briefing was held for responding officers. (PFOF ¶¶ 22.) According to Inspector Stephen Basting and other command staff, the mission for the special assignment was to ask people at the site of the memorial at 44th and Auer to leave, give them some time to do so, and then make arrests of people who did not obey an order to leave. (PFOF ¶ 23.) The general plan was to issue tickets for disorderly conduct, rather than for failure to disperse from an unlawful assembly, regardless of the underlying conduct of those arrested. (PFOF ¶ 24.)

Although Harpole denies that he intended to have people arrested solely for failure to disperse, other witnesses and multiple documents make clear that this was in fact the plan and that people were in fact arrested merely for failure to disperse. (PFOF ¶ 25.) That is how individual officers understood the orders from command staff. (PFOF ¶ 26.) And an Internal Affairs investigator determined that the directive to disperse the crowd came from Harpole. (PFOF ¶ 27.) However, MPD never formally declared an unlawful assembly and did not follow procedures commonly used for declaring an unlawful assembly, such as using an amplification device, identifying the conduct that was unlawful, or directing people to particular exit routes. (PFOF ¶ 28.)

After police arrested several people who did not disperse at the memorial site, Harpole sent an email declaring that "44 and Auer is clear, we own it." (PFOF ¶ 29.) Pursuant to the plan, "teams" of officers in riot gear then "went mobile" in vans to respond to "hot spots" identified by radio transmissions from the command post and to disperse groups found at those locations. (PFOF ¶ 30.) Team 2 was under the command of Defendant Raymond Brock, an MPD Sergeant. (PFOF ¶ 31.) Brock understood his team's orders to be to break up any groups of people and make one or

5

two arrests at each location to secure compliance. (PFOF ¶ 32.)[3] Harpole admitted that making some arrests to secure compliance from a larger group was a familiar crowd control tactic. (PFOF ¶ 33.)

At approximately 9 p.m., a half an hour after the dispersal and arrests of people at the memorial site, Plaintiff McGowan was walking west on Burleigh Avenue, west of Sherman Boulevard. (PFOF ¶ 34.) She had come to the neighborhood by herself to pray for healing. (PFOF ¶ 35.) She was not present when MPD's dispersal order was given or arrests made at 44th and Auer. (PFOF ¶ 36.) Once she saw the police presence on Auer, she decided to go to her children's grandparent's house a few blocks further west. (PFOF ¶ 37.)

As McGowan was walking on the public sidewalk on the north side of Burleigh, Defendant Wallich approached her and said abruptly "you gotta go," without explaining the reason she had to leave. (PFOF ¶ 38.) Wallich and Ghassoul admit that McGowan was doing nothing for which she could have been arrested at the time Wallich approached her. (PFOF ¶ 39.) McGowan was alone when Wallich approached her. (PFOF ¶ 40.) There was no "civil disorder" at that location at that time and McGowan was not part of an "unlawful assembly." (PFOF ¶ 41.) When McGowan asked why she had to leave and how she could get to her destination, Wallich and Ghassoul handcuffed and arrested her (PFOF ¶ 42.) Approximately 22 seconds elapsed between the time Wallich first ordered McGowan to disperse and her arrest. (PFOF ¶ 43.) This abrupt command to disperse and near immediate arrest was consistent with Wallich's understanding of MPD's mission: "To disperse the crowds. If the crowds weren't leaving, you ask them once. And if they

_____

[3] Plaintiffs have compiled segments of several body camera videos from members of Team 2, a facebook live video streamed by English that night and a Fox 6 news video into a single summary video that begins with a directive from an MPD command staff member to Team 2 members to respond to hot spots and make arrests, and culminates in the arrest of English. *See* Muth Decl., Ex. 1101. (Ms. McGowan's arrest appears on only two videos, so a summary or compilation video was not prepared.)

6

don't leave, you place them under arrest." (PFOF ¶ 44.)

McGowan asked the arresting officers and Sergeant Wade Grubich why she had been arrested and explained that she had done nothing wrong. (PFOF ¶ 45.) Despite having the authority to release McGowan on the scene, Grubich simply told her she was arrested because she was out at a "time of civil unrest" and declined to release her without questioning the arresting officers. (PFOF ¶ 46.) She was held in a police van for a period of time, transported to the downtown police station to be processed, and released with a ticket for disorderly conduct, which was subsequently dismissed. (PFOF ¶ 47.)

Around the same time, Plaintiff English, then an organizer and legal observer with the ACLU of Wisconsin, learned of reports of a large police presence near the memorial at 44th and Auer. (PFOF ¶ 48.) He drove to the neighborhood, parked his car and walked to the east side of Sherman Boulevard at the intersection of Auer Avenue, where state Representative Jonathan Brostoff and other elected officials were present and speaking with young people about the earlier MPD operation dispersing people at the memorial and about their views on police and the community. (PFOF ¶ 49.) English began livestreaming video of the police across Sherman from his phone to Facebook and encouraged listeners, especially elected officials, to take a different approach to managing the mourners. (PFOF ¶ 50.) English was not engaged in any unlawful conduct. (PFOF ¶ 51.) He had not been present almost an hour earlier when the MPD dispersal order was given or when the arrests were made at 44th and Auer. (PFOF ¶ 52.) While one person near the group may have been loud, none of the witnesses at that location believed that the group of young people was causing a disturbance that warranted arrest. (PFOF ¶ 53.)

A few minutes before 9:30 p.m., then-Lieutenant Derrick Harris claims to have heard, from his position across Sherman Boulevard, loud cursing by someone in that group, and called for a

7

team to order them to disperse.[4] (PFOF ¶ 54.) Harris did not identify any specific individual causing a disturbance and acknowledged that he could not do so. (PFOF ¶ 56.) However, no MPD witness who was asked was able to identify any "disturbance of public order" that would make it "reasonable to believe that" the group would "cause injury to persons or damage to property unless it [was] immediately dispersed." (PFOF ¶ 57.) The group was not blocking traffic on the adjacent streets, which were already shut to traffic by the police. (PFOF ¶ 58.)

Team 2, finished with its arrest of McGowan on Burleigh, was dispatched by the command post to the corner of Sherman and Auer with the instructions, "There's a group of subjects gathering. They need to be advised that they will need to be leaving." (PFOF ¶ 59.)

A short time after English arrived, at approximately 9:30 p.m., a police van pulled up to the corner and multiple officers in riot gear, including Brock, Wilkiewicz and Ghassoul, exited the van. (PFOF ¶ 60.) Brock intended to make two arrests at the location to induce the crowd to disperse. (PFOF ¶ 61.) Immediately after exiting the van, Brock, Ghassoul and Laroque ordered the people standing at the corner to disperse. Eight seconds later, Brock gave a contradictory order, for people to put their hands on a parked car. (PFOF ¶ 62.) None of the officers declared an "unlawful assembly." (PFOF ¶ 63.) None of the officers investigated or tried to determine which individuals might have been loud, cursing, drinking or otherwise disorderly. (PFOF ¶ 64.) Nor have Defendants identified any complaints received from any the residents of the houses in front of which the group was standing and talking. (PFOF ¶ 65.)

_____

[4] There is a dispute as to whether there was loud cursing. English's Facebook video and body worn camera video from two officers facing the corner from across Sherman do not reveal loud cursing (PFOF ¶ 55), but some witnesses recalled an obnoxious person near the corner. However, that dispute need not be resolved to decide this motion. As explained below, cursing alone does not constitute disorderly conduct, and even if one person was engaged in disorderly conduct, there is no evidence the entire group or any other members of the group were engaged in such unlawful conduct or constituted an unlawful assembly that might justify action against the group as a whole.

8

Approximately 16 seconds after giving the contradictory orders to disperse and to put their hands on the car, Brock ordered officers to arrest two people and pointed at English, who had already crossed the street and moved away from where he had been standing when Brock gave his initial orders. (PFOF ¶ 66.) Brock, Wilkiewicz and Ghassoul arrested English as he was walking away, a scant 50 seconds after Brock issued his dispersal order. (PFOF ¶ 67.) Brostoff was arrested when he moved away from the car to see what was happening to English and tried to record the arrest on his phone. (PFOF ¶ 68.) English was forced to the ground, handcuffed, involuntarily searched and placed in a paddy wagon. (PFOF ¶ 69.) After officials became aware that they had arrested a state legislator, Brostoff and English were released without charges. (PFOF ¶ 70.) Then-Inspector Michael Brunson, who made the decision to release them, told English and Brostoff, "Well, the bottom line is that sometimes misunderstandings happen, we understand that, so we're gonna go ahead and, uh, you know, count this up as a misunderstanding." (PFOF ¶ 71.)

Police witnesses, including Defendants, admit they did not see either Plaintiff engage in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly behavior. (PFOF ¶¶ 72, 73.) In fact, Harris acknowledged that English and Brostoff "were not part of the behavior" he observed from across Sherman Boulevard. (PFOF ¶ 74.) The only "misconduct" by either Plaintiff prior to their arrests that any officer or other witness has identified was failure to immediately obey a purportedly "lawful order" to disperse. (PFOF ¶¶ 75, 76.)

**ARGUMENT**

A Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of a factual dispute will defeat summary judgment only if the facts at issue are material under the applicable legal standard.

9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Substantive law will identify which facts are material for purposes of summary judgment, as only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes that are irrelevant or unnecessary will not be counted."); *McGinn v. Burlington N.R.R.*, 102 F.3d 295, 298 (7th Cir. 1996) ("Only disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment").

## I.    THE UNDISPUTED RECORD ESTABLISHES THAT DEFENDANTS VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHTS OF ASSEMBLY AND FREE EXPRESSION.

In the context of managing group expressive and associational activity protected by the First Amendment, law enforcement has a duty to facilitate people's exercise of those rights. Suppressing or terminating such activity in public places will seldom, if ever, be justifiable, unless it poses a "clear and present danger" of "imminent lawlessness." *Hess v. Indiana*, 414 U.S.105, 108 (1973); *see also Cantwell v. Connecticut,* 310 U.S. 296 (1940); *Terminiello v. City of Chicago,* 337 U.S. 1 (1949); *Edwards v. South Carolina,* 372 U.S. 229 (1963); *Cox v. Louisiana,* 379 U.S. 536 (1965); *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Gregory v. City of Chicago,* 394 U.S. 111 (1969). In balancing the First Amendment's assembly and speech rights against the state's power to maintain the peace, "the scale is heavily weighted in favor of the First Amendment." *Bible Believers v. Wayne Cty., Mich*., 805 F.3d 228, 252 (6th Cir. 2015). Law enforcement may not ban or interrupt protected activity because of the mere potential for disturbance or disorder. *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 516 (1939) ("uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right").

In this case, Plaintiffs' expressive and associational activity took place in the classic public forum of city sidewalks and streets, where the First Amendment's protection is at its most robust

10

and government's power to restrict private expression and assembly is at its lowest ebb. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Traditional public fora include those public spaces "like streets, sidewalks, and parks, which by custom have long been open for public assembly and discourse." *Denver Area Educational Telecommunications Consortium v. FCC*, 518 U.S. 727, 791 (1996).

Here, English and McGowan were present on the sidewalks and streets of the Sherman Park neighborhood specifically because of the protest and grieving taking place that evening, and thus their presence constituted a direct exercise of their rights of expression and association protected by the First Amendment. English was associating with a group that included elected officials communicating with citizens who were upset about police actions – both the earlier killing of Sylville Smith and the militarized effort to "restore order" to the neighborhood an hour earlier. (PFOF ¶ 49.) He was also in the area for the purpose of observing, recording, transmitting and commenting on the police suppression of grieving and protesting community members. (PFOF ¶ 50.)[5] The First Amendment protects the right to observe and record police officers performing their duties in public. *See, e.g.*, *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 599–600 (7th Cir. 2012) (holding that a statute that would prohibit recording police officers with a cell phone violated the First Amendment); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("the Constitution protects the right of individuals to videotape police officers performing their duties in public").

McGowan wished by her presence to express solidarity with a grieving community and

---

[5] There is also nothing unlawful about being present in a particular location, even if it is not for purposes protected by the First Amendment. Pedestrians may lawfully stand, loiter or travel upon the streets so long as their presence does not interfere with vehicular traffic, consistent with s. 101-1-2 of the code of ordinances, adopting Wis. Stat. § 346.29(2) ("No person shall stand or loiter on any roadway . . . *if such act interferes with the lawful movement of traffic*."). "Loitering," without engaging in some other unlawful activity, cannot constitutionally be punished. *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972).

11

pray for peace in the neighborhood. (PFOF ¶ 35.) Ms. McGowan was also engaged in protected activity when she questioned Officer Wallich's unexplained order to leave an area in which there was no curfew in effect. The First Amendment protects the right to challenge police actions. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987). Even harshly worded challenges to police authority are protected. *Lewis v. City of New Orleans*, 415 U.S. 130, 132 (1974) (ordinance prohibiting "any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty" unconstitutional).

In general, the Supreme Court has permitted the government to suppress such associational or expressive conduct in public spaces in only two narrow circumstances: (1) when the speech constitutes "fighting words," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 574 (1942); or (2) when the speech "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447; *Hess*, 414 U.S. at 107-09 (statement that protesters would "take the fucking street later (or again)" may not be punished because "there was no rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder.").

Law enforcement generally must respond to acts of violence, property damage or other illegal conduct by identifying and addressing *the individuals responsible*, not by indiscriminately dispersing or otherwise suppressing protected activity. *See Cox*, 379 U.S. at 551; *see also Kunz v. People of State of New York*, 340 U.S. 290, 294-95 (1951) (remedies for actual lawlessness permissible, but not prior restraint on speech).

12

Merely disobeying a dispersal order cannot be a basis for arrest, unless that dispersal order was itself lawfully predicated on other illegal activity by the person arrested. In *State v. Werstein*, 60 Wis. 2d 668, 211 N.W.2d 437 (1973), the Wisconsin Supreme Court expressly rejected the state's argument that mere "refusal to obey a police command constituted disorderly conduct." 60 Wis. 2d at 673. "[T]o hold without limitation that any violation of a police command, whether or not lawful, constitutes disorderly conduct would be patently violative of the Fourteenth Amendment." *Id.* at 675. Citing *Gregory*, *supra*, the Court held that "refusal to obey a police order" to disperse, "however reasonable the request and however laudable [the police] motives," could not support a disorderly conduct conviction. *Id.*; *see also Gregory*, 394 U.S. at 120 (Black, J., concurring) ("Their guilt of 'disorderly conduct' therefore turns out to be their refusal to obey instanter an individual policeman's command to leave the area of the Mayor's home. . . . [T]he conduct involved here could become 'disorderly' only if the policeman's command was a law which the petitioners were bound to obey at their peril. But under our democratic system of government, lawmaking is not entrusted to the moment-to-moment judgment of the policeman on his beat.").

It is particularly important that courts are vigilant in preventing the use of disorderly conduct statutes to chill or suppress speech. In *Bell v. Keating*, 697 F.3d 445, 457 (7th Cir. 2012), the Seventh Circuit struck down an ordinance permitting "law enforcement [to] order an individual to disperse when at least three others in his vicinity behave in a way that amounts to disorderly conduct 'likely to cause substantial harm or serious inconvenience, annoyance or alarm.'" The Court noted that "when individuals ordered to disperse or move along manifest a 'bona fide intention to exercise a constitutional right,' a city may criminalize their refusal only when its 'interest so clearly outweighs the [individuals'] interest sought to be asserted that the latter must

13

be deemed insubstantial.'" *Id.* at 459 (quoting *Colten v. Kentucky*, 407 U.S. 104, 111 (1972)). The Seventh Circuit invalidated the ordinance as substantially overbroad when applied to conduct that does not threaten "substantial harm," defined as "physical danger or damage to the people or property nearby." *Bell*, 697 F.3d at 458. The court held that "dispersal orders against people exercising First Amendment rights" are unconstitutional even "when those around them are likely to foster serious inconvenience or alarm," if dispersal is not "*necessary*" and "integral" to law enforcement's ability to control illegal activity, or when the conduct triggering dispersal merely "foster[s] annoyance," as opposed to threatens "substantial harm." *Bell,* 697 F.3d at 461. Thus, dispersal is unconstitutional "when a serious inconvenience may be alternatively controlled." *Id.* at 459.

In *Collins v. Jordan*, the court rejected a city's attempts to curtail protests, which had included some violence, because of the unique protections afforded to such activity under the First Amendment:

> Demonstrations can be expected when the government acts in highly, controversial ways, or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence, the more likely people are to demonstrate. Some of these demonstrations may become violent. The courts have held that *the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct* as a prophylactic measure.

110 F.3d 1363, 1371-72 (9th Cir. 1996) (emphasis added).

Neither McGowan nor English engaged in incitement to violence or fighting words, and no Defendant or witness has asserted otherwise. Defendants and MPD witnesses have repeatedly asserted that the activities of *other people* at *other places* on the evening of August 30 were unlawful. For example, they have asserted that people at the site of the memorial to Smith engaged

14

in disorderly conduct. But that conduct occurred at least a half hour before McGowan was arrested at a location more than a block away, and more than an hour before English was arrested in a location where there were only a handful of people.

Defendants assert that *someone* in the group of people on the northeast corner of Sherman and Auer with English was loudly cursing. But they do not assert that English himself uttered profanities or even spoke loudly.[6] Moreover, vulgarities uttered in public do not constitute a "serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," *Virginia v. Black*, 538 U.S. 343, 359 (2003), and thus do not constitute a "true threat." Nor can such statements be construed as fighting words. The fighting words doctrine permits the punishment only of "the sort of provocatively abusive speech that inherently tends to incite an immediate breach of the peace." *Purtell v. Mason*, 527 F.3d 615, 625 (7th Cir. 2008). Such speech must be "personally insulting" and "directed at a particular person." *Id.* (*citing Hess*). Harsh language – even profane, vulgar and offensive language – cannot be made a crime unless it is likely to provoke immediate, violent retaliation. *See Lewis*, 415 U.S. at 134; *see also Cohen v. California*, 403 U.S. 15, 18-22 (1971) (reversing disturbing peace conviction of man who wore jacket with words "Fuck the Draft" in courthouse).

Police witnesses have admitted that there was no "unlawful assembly" at the time of Plaintiffs' arrests that would have justified a dispersal order. (FOF ¶¶ 41, 57, 58.) And even if an order to disperse could be justified here, the nature of Defendants' dispersal orders did not justify

---

[6] As noted elsewhere, the constitution does not permit arrest or prosecution of a person for proximity to or association with someone else who commits a crime. In the context of arrests of people engaged in protest or similar mass expressive activity, the First Amendment protects against the suppression of one speaker's expression because of another's conduct, *see, e.g.*, *Collins*, *supra*, while the Fourth Amendment protects against unlawful arrests by requiring probable cause *individualized* to the person arrested. *See, e.g.*, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), *infra*.

15

Plaintiffs' arrests, because it was overbroad. When declaring an unlawful assembly, "the police must of course direct and control demonstrators only to an extent sufficient to protect legitimate state interests . . . . In ordering obstructive demonstrators to 'move on' the initial police objective must be merely to clear passage, not to disperse the demonstrators, or to suppress the free communication of their views." *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107, 117-18 (D.C. Cir. 1977).[7]

## II.   THE UNDISPUTED RECORD SUPPORTS PLAINTIFFS' FOURTH AMENDMENT CLAIMS.

### A.   The Undisputed Record Establishes That the Arrests of Benetria McGowan and Jarrett English Were Unlawful Since There Was No Probable Cause to Arrest Them for Their Peaceful Presence in Public Spaces.

#### 1.   Legal Standard for Wrongful Arrest.

To prevail in a claim of wrongful arrest in violation of the Fourth Amendment under 42 U.S.C. § 1983, plaintiffs must prove: (1) they were arrested by defendants, (2) defendants did not have probable cause to arrest them, and (3) defendants acted under color of law. Pattern Civil Jury Instructions, §7.07 (7th Cir. 2017). With respect to both Plaintiffs McGowan and English, there is no plausible dispute that uniformed officers of the Milwaukee police department arrested each Plaintiff (PFOF ¶¶ 42, 67), and did so under color of law. (Answer to Amend. Compl. [Dkt 28] ¶¶ 11-17.) The only remaining element is whether probable cause to make an arrest existed.

A police officer has probable cause to arrest if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to permit a prudent person to believe

---

[7] Even a dispersal order that is narrowly tailored to avoid suppressing speech while protecting safety must apprise the crowd "as a whole" that it must leave and give persons a "reasonable opportunity to comply." *See Barham v. Ramsey*, 434 F.3d 565, 575-76 (D.C. Cir. 2006). "Fair notice" is "notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." *Id.* at 576. Warnings must inform people how much time they have to disperse, the consequences of failure to disperse, and a clear exit path to follow. *Morales*, 527 U.S. at 59; *Wright v. State of Georgia*, 373 U.S. 284, 293 (1966); *Barham*, 434 F.3d at 568.

that the suspect had committed, is committing, or is about to commit an offense. *Rooni v. Biser*, 742 F.3d 737 (7th Cir. 2014). As this Court noted in *Hardy v. City of Milwaukee*, 88 F.Supp.3d 852 (E.D. Wis. 2015), the inquiry is "purely objective, requiring an examination of how a reasonable officer would act, knowing what the arresting officer knew at the time of the arrest." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713–14 (7th Cir. 2013) (citations omitted).

To justify an arrest, an officer must have information that the *individual suspect arrested* has committed an offense; the fact that *someone* in the area has committed an offense is not sufficient. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."); *United States v. Ellis*, 499 F.3d 686, 690 (7th Cir. 2007) ("mere presence at the scene of a crime is not enough to establish probable cause"); *United States v. Hartsell,* 432 F. Supp. 3d 805, 817 (N.D. Ind. 2020) ("[T]he Fourth Amendment requires that probable cause be individualized – not just to the time of arrest, but specific to each defendant.").

Even – or perhaps especially – in the context of mass protest, a lawful arrest requires such individualized probable cause. *See, e.g.*, *Vodak v. City of Chicago*, 639 F.3d 738, 746-47, 750 (7th Cir. 2011) (arrest for failure to disperse violates Fourth Amendment where notice was inadequate; noting risk of arrest of innocent demonstrators when mass arrests are made); *Fogarty v. Gallegos*, 523 F.3d 1147, 1158 (10th Cir. 2008) ("The defendants' arguments that the police had probable cause to arrest Fogarty rest only on characterizations of the protest in general, and not on evidence of Fogarty's individual actions. The Fourth Amendment plainly requires probable cause to arrest Fogarty as an individual, not as a member of a large basket containing a few bad eggs. In other words, that Fogarty was a participant in an antiwar protest where some individuals may have broken the law is not enough to justify his arrest."); *Jones v. Parmley*, 465 F.3d 46, 60 (2d Cir.

17

2006) (where individuals among group of protestors may have committed crime by blocking interstate highway, but officers could not identify which demonstrators had done so, officers "could not, then, have reasonably thought that indiscriminate mass arrests without probable cause were lawful under these circumstances"); *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281-82 (10th Cir. 2008) ("We consider whether probable cause existed with respect to each [protester arrested].").

Probable cause also is evaluated with respect to the elements of a specific crime defined by state law.

> Whether a local police officer would be authorized to make an arrest typically turns initially on state law. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir.2001). The Fourth Amendment question is whether the officers had probable cause to believe that the predicate offense, as defined by state law, had been committed. *Williams*, 269 F.3d at 782.

*Brunner v. McKillip*, 488 F.Supp.2d 775 (W.D. Wis. 2007).

The Wisconsin statute and the Milwaukee Municipal Code section defining the crime of disorderly conduct are identical in all material respects:

> **Wis. Stats. § 947.01 Disorderly conduct**.
> (1) Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.

> **Milw. Municipal Code § 106-1. Disorderly Conduct**.
> 1. PROHIBITED. It shall be unlawful for any person to engage, in a public or private place, in violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly conduct under circumstances in which such conduct tends to cause or provoke a disturbance.

McGowan was charged with disorderly conduct, and Brock told English that he was arrested for disorderly conduct. (PFOF ¶¶ 47, 69.) The MPD's general plan was to issue tickets for disorderly conduct to anyone arrested during the operation. (PFOF ¶ 24.) Defendants concede that

18

they did not observe either Plaintiff being "violent, abusive, indecent, profane, boisterous, [or] unreasonably loud." (PFOF ¶¶ 72, 73.) This leaves only the possibility of "otherwise disorderly conduct" which "tends to cause or provoke a disturbance." The Wisconsin Supreme Court has interpreted this phrase under Wisconsin law to require both conduct that is itself similar to the specifically enumerated conduct *and* that has the tendency to cause a disturbance. *State v. Givens*, 28 Wis.2d 109, 115 (1965); *State v. Douglas D.*, 2001 WI 47, ¶15, 243 Wis.2d 204. While this requires a context-specific assessment of the circumstances involved, *Weirstein*, 60 Wis.2d at 672-73, under Wisconsin law the mere failure to obey a police command, like those here, does not rise to the level of disorderly conduct. "This court has likewise never held that the mere refusal to obey a police command constitutes disorderly conduct." *Id.* at 676. Here as in *Werstein*:

> [I]t is uncontroverted that the defendants' conduct was not violent, abusive, indecent, profane, boisterous or unreasonably loud. The defendants were merely present. Mere presence absent any conduct which tends to cause or provoke a disturbance does not constitute disorderly conduct.

*Id.* at 674.

Applying these well-established definitions of probable cause, and analyzing the clear video,[8] documentary and testimonial record in this case in light of these principles, requires that summary judgment be granted in favor of the Plaintiffs.

### 2. McGowan Was Not "Otherwise Disorderly."

Wallich's and Ghassoul's body camera footage shows the entire encounter leading to McGowan's arrest. The arrest took place at approximately 9:00 p.m. on Burleigh Street, on a public

---

[8] The Supreme Court has instructed district courts that a video record of events may provide the basis for awarding summary judgment, even when the opposing party attempts to contradict the video with affidavits. Where, as here, the video record shows what happened, the court should not adopt a subsequent, contradictory version of facts submitted by affidavit for purposes of ruling on a summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

19

sidewalk with traffic passing by and nearby businesses open to customers. The audio reveals their entire dialog:

| | |
|---|---|
| Wallich: | You got to go |
| McGowan: | I gotta go? |
| Wallich: | Yeah, you'll be arrested. |
| | I'm telling you once, leave now or you will be arrested. |
| McGowan: | OK, I just got here, I'm walking… |
| Wallich: | I don't care. Go that way |
| LaRoque: | Go around. Go around. |
| McGowan: | OK, but I'm going on 46th [cross talk] |
| Wallich: | I don't care. Last time, leave now or you're getting arrested. |
| McGowan: | Even though I am an adult… |
| Wallich: | …Yes… |
| McGowan: | …I'm confused. You're not going to ask for my ID or nothing like that? |

[Wallich takes McGowan's wrists and starts to handcuff her].

McGowan:    Because I asked you a question I'm being arrested?"

(PFOF ¶¶ 38, 40, 42.)

A total of 22 seconds passed from the time Wallich stated "You got to go" to the time that Wallich grasped McGowan's wrists to place her into custody. (PFOF ¶¶ 43.) As the body cam video shows, McGowan was calm, polite and never raised her voice or was disruptive throughout the entire encounter. Wallich acknowledged in her deposition that she had not observed McGowan engaged in any criminal conduct before telling her to turn and go a different way and that the sole basis for arrest was failing to follow the officer's orders within seconds:

> Q. Was there anything about her presence that struck you as disorderly at that time?
> A. Disorderly? Just not following my order. That was it.

(PFOF ¶ 39.)

McGowan was handcuffed, put into a police van, transported to a district station and ultimately issued a citation for disorderly conduct. A Milwaukee municipal judge dismissed the disorderly conduct citation on January 4, 2017. (PFOF ¶ 47.)

20

Given the clear Wisconsin precedent under *Werstein* that a police order to leave, issued to an otherwise orderly person in a public place, cannot form the basis of a disorderly conduct charge, Defendants Wallich, Gassoul and Laroque lacked probable cause to arrest McGowan and take her into custody.

### 3. English Was Not "Otherwise Disorderly."

Shortly after McGowan was arrested, the same team of officers arrested English in a similarly baseless fashion.[9] English was arrested after the van containing Team 2 pulled up at the corner of Sherman and Auer. A small group of people had gathered talking a short distance to the east of this corner. Among other people in the group was Plaintiff English of the ACLU of Wisconsin and two elected officials, Brostoff and Glendale School Board Member Tomika Vukovic. (PFOF ¶ 45.)

Here too, the video record is clear and straightforward. Team 2 arrives and jumps out of the van. (PFOF ¶ 60.) Different officers gave people in the group, which included English and public officials, contradictory instructions: to leave, and to put their hands on the car. English calmly walked away from the group, announcing he worked for the ACLU, crossed to the opposite side of the street, crossed the sidewalk on that side, and proceeded onto a grassy area opposite the scene when Brock suddenly pointed at English and another person and said "get him and get him." (PFOF ¶¶ 62, 66-67.)

Team 2 had been dispatched to this corner because Harris says he observed loud language and cursing. (PFOF ¶ 54.) But Harris admits he could not identify any specific individual engaged in that conduct because of his distance from the group and the darkness of the evening and also

---

[9] As explained in n.3 above, Plaintiffs created a single video that compiles relevant excerpts from multiple body camera and other videos depicting the arrest of Mr. English. *See* Muth Decl., Ex. 1101.

admits that English was not involved in the conduct. (PFOF ¶ 56.) As explained above, the misconduct of one person (or even multiple people) does not establish probable cause to arrest another person, MPD's apparent belief to the contrary notwithstanding. That there were other people present, some of whom may have been engaged in unlawful conduct, did not give Defendants probable cause to arrest English.

### B.     If an Arrest is Unlawful, Any Force Used in Making It Is "Excessive."

Under the Fourth Amendment every person has a constitutional right to be free from excessive force by law enforcement officers performing their duties. Law enforcement may not use more force than is reasonably necessary. *Payne v. Pauley.* 337 F.3d 767, 778 (7th Cir. 2003). While evaluation of an excessive force claim ordinarily requires a factual inquiry that would preclude summary judgment, because the undisputed facts in this case establish that Plaintiffs were falsely arrested, the force used in executing the arrests is per se unlawful.

An officer's use of force is unconstitutional if "judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Payne*, 337 F.3d at 778 (*quoting Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)). When an arrest is achieved by any physical seizure, if the arrest itself is without probable cause and thus unlawful, the force used in effectuating that arrest is *per se* excessive. *See Payne*, 337 F.3d at 1043 (even minor force of chafing handcuffs is excessive "where complainant had violated no law, was arrested without probable cause and did not resist").

Fourth Amendment jurisprudence has consistently held that, when the defendant "had no reason whatsoever to suspect plaintiff of wrongdoing, any use of force, however slight, becomes objectively unreasonable under the circumstances and would support a finding of liability on plaintiff's excessive force claim." *Brunner v. McKillip*, 488 F. Supp. 2d 775, 786 (W.D. Wis.

22

2007); *see also Reese v. Herbert*, 527 F.3d 1253, 1273 (11th Cir. 2008) ("In the absence of probable cause, [the officer] was not justified in using any force against [the plaintiff]."). The Seventh Circuit has held that any forcible arrest can "cross the constitutional threshold," and this is particularly true when the original arrest was not supported by probable cause. *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1043 (7th Cir. 2002) (quoting *Lester,* 830 F.2d at 712).

As explained above, there is no material dispute that English and McGowan were unlawfully arrested. Defendants admit that "McGowan was physically stopped by [Wallich, Ghassoul and Laroque], and her wrists were cuffed behind her back with flexi cuffs." Answer to Amend. Compl. [Dkt. 28] ¶ 41. Defendants admit that McGowan was then taken into police custody and placed in a Milwaukee police conveyance vehicle and was transported to the downtown police district. *Id.* at ¶ 44. The forceful arrest of McGowan, who was not threatening harm to anyone, was not resisting or evading arrest, was not attempting to flee, and was not violating any law, was not objectively reasonable. When "an illegal arrest sets off a chain of indignities inflicted on the helpless victim, including offensive physical touchings that would be privileged if the arrest were lawful, she is entitled to obtain damages for these indignities…" *Herzog*, 309 F.3d at 1044.

Similarly, Defendants admit that Brock ordered Wilkiwicz and Ghassoul to arrest English. (Dkt. 28 ¶ 32). Defendants admit that Brock, Wilkiwicz and Ghassoul forced English to the ground where officers secured his wrists and connected them behind his back using flexi cuffs. *Id.* at ¶ 33. Defendants also admit that English was then seated in a police conveyance vehicle. *Id.* at ¶ 35.

Because there are no issues of material fact as to the unlawful arrest of English and McGowan this Court should conclude on summary judgment that the force used was excessive. However, if the court finds that there are genuine issues of material fact as to the unlawful nature

23

of the arrests, Plaintiffs are entitled to a trial on whether the amount of force used under the circumstances was excessive. *Payne*, 337 F.3d at 770 (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) ("[T]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial").

III. **THE UNDISPUTED RECORD SHOWS THE CITY OF MILWAUKEE IS LIABLE FOR CHIEF FLYNN'S AND ASSISTANT CHIEF HARPOLE'S UNCONSTITUTIONAL DECISIONS TO INDISCRIMINATELY DISPERSE AND ARREST PEOPLE.**

A. **Standards for Municipal Liability.**

A municipality is liable for violations of constitutional rights under 42 U.S.C. § 1983 if the alleged unconstitutional conduct arises from a policy, ordinance, or custom of local government and implementation of such policy or custom caused the alleged injury. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978). Plaintiffs can establish municipal liability by showing that a constitutional violation was caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; *or* (3) a decision by a municipal agent with final policymaking authority. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017).

A municipality is liable for the decisions of an individual government "decisionmaker [who] possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Such a decision maker may "establish policy" by making "a single decision to take unlawful action," where the action is "a deliberate choice to follow a course of action . . . from among various alternatives." *Id.* at 483. *Monell* liability can be shown by a "single decision attributable to a municipality." *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1997). Plaintiff must establish "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664,

24

675 (7th Cir. 2009); *see also Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002).

"[P]roof that a municipality's legislative body *or authorized decisionmaker* has intentionally deprived a plaintiff of a federally protected right necessary establishes that the municipality acted culpably." *Bradley v. Vill. of Univ. Park*, 929 F.3d 875, 885 (7th Cir. 2019) (emphasis added) (quoting *Bryan County*, 520 U.S. at 405).

Indeed, the inquiry "is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker in a particular area, or on a particular issue." *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009). As the Supreme Court noted in *Pembaur*, "municipalities often spread policymaking authority among various officers and official bodies." 475 U.S. at 483. Thus, "particular officers may have authority to establish binding [municipal] policy respecting particular matters and to adjust that policy for the [municipality] in changing circumstances." *Id*. Courts have consistently held that there can and often are multiple final policy makers responsible for constitutional deprivations suffered by *Monell* plaintiffs. *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997); *Valentino*, 575 F.3d at 674 (reiterating standard from *Monell* which requires showing "an individual with final policy-making authority for the municipality *(on the subject in question)* caused the constitutional deprivation.") (emphasis added); *see also Speer v. City of Wynne, Ark.*, 276 F.3d 980, 986 (8th Cir. 2002) ("situations may arise where the combined actions of *multiple* officials or employees may give rise to a constitutional violation, supporting municipal liability. . . .") (emphasis added).) The question is whether the decision maker was "at the apex of authority for the action in question." *Vodak*, 639 F.3d 748.

The Seventh Circuit has held that a police chief is the final policy maker with regard to law enforcement decisions related to crowd control for demonstrations and other expressive activity,

unless some other policy-making entity has expressly taken steps to limit the authority of the chief. *See Vodak*, 639 F.3d at 747-48 ("The City Council can enact ordinances that constrain the [Police] Superintendent's authority to make mass arrests in demonstration situations, but it hasn't done so, and thus it has allowed him to be sole policymaker. . . ."); *see also Congine v. Village of Crivitz*, 947 F. Supp. 2d 963, 974-76 (E.D. Wis. 2013) (police chief final policy maker with regard to law enforcement approach to maintaining order and safety during parade).

In *Vodak*, the Seventh Circuit had to determine whether the police superintendent was the final policymaker for an operation which resulted in the arrests of more than 900 individuals at a spontaneous demonstration in downtown Chicago. The court held that the Chicago police superintendent had the "sole responsibility to make policy regarding control of demonstrations." 639 F.3d at 748. The court rejected the city of Chicago's argument that the police superintendent had no authority over demonstrations and mass arrests outside of ordinances enacted by Chicago City Council. The Court explained that the city council may guide or constrain the police superintendent, but ordinances do not affect the superintendent's authority to exercise the power granted to the superintendent by law. *Id.* at 749 ("Authority and the tools for exercising it are distinct.").

To establish liability under §1983, a municipal policy must also be "affirmatively linked to the constitutional violation" and be the "moving force behind it." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *Arlotta v. Bradley Ctr.*, 349 F.3d 517, 522 (7th Cir. 2003). This "causal connection" can be established by, *inter alia*, "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Keating v. City of Miami*, 598 F.3d 753, 762-64 (11th Cir. 2010). Additionally, it is well established that constitutional violations can and do have multiple

26

sufficient causes. *See Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012); *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 621 (7th Cir. 2002).

**B. The Facts Here Establish that Final Policy Makers Ordered Unconstitutional Actions.**

Here, Plaintiffs present a straightforward *Monell* claim in which their harm directly flows from a decision made by the municipality's final decision makers to engage in an unconstitutional practice.[10] The decision to indiscriminately disperse lawfully present individuals from the Sherman Park neighborhood and arrest those who failed to comply was made by Chief Flynn and operationalized by Assistant Chief Harpole and other command staff. (PFOF ¶ 17, 19.) Flynn and Harpole were "final policy makers" for purposes of the operation on August 30, 2016, such that their decisions constitute the policy of the City.

Like the police superintendent in *Vodak* and the police chief in *Congine*, Flynn and Harpole possessed "final authority" to decide on the policy and actions MPD would take in the Sherman Park neighborhood on August 30, 2016. (PFOF ¶¶ 17, 19.) And they clearly acted on that authority. Upon receiving the e-mail from Flynn directing that he "restore order," Harpole gathered the necessary command staff and devised a plan to disperse all individuals near the memorial site at 44th and Auer, regardless of anyone's reason for being in the area, and to use mobile teams to break up other groups that formed in the neighborhood. (PFOF ¶¶ 21-27.)

McGowan and English were among the victims of the unconstitutional policy, adopted by Flynn and Harpole, to disperse civilians and "restore order" by making indiscriminate arrests of those who failed to disperse. In this case, as in *Vodak*, Chief Flynn had the sole responsibility to

---

[10] Disputes of material fact emerged in discovery regarding whether the MPD also had a widespread custom or practice of using unlawful dispersal orders and indiscriminate arrests in similar contexts. Accordingly, the parties should proceed to trial on the question of custom and practice as another basis for municipal liability.

set policy on how to control assemblies of people in Sherman Park and did so by ordering his subordinates to "restore order" by all available means, including making arrests for disobeying any police order to disperse. Flynn notified the Mayor's chief of staff of MPD's plans to put an end to mourning and protest over the shooting of Sylville Smith, but he was not seeking and did not need approval for that decision. (PFOF ¶ 17.) Flynn alone determined to end the protests and adopted a policy to deploy MPD's resources to effectuate that determination.

While Chief Flynn was setting the overall policy for the August 30 operation, Assistant Chief Harpole was authorized to and did in fact operationalize the policy. Accordingly, his actions set "municipal policy" at the operational level, where he was at the "apex of authority." (PFOF ¶ 19.) Harpole also was present at the mobile command center where he was monitoring the Sherman Park operation to ensure the police department would "own" the neighborhood. (PFOF ¶ 29.)

These decisions by Flynn and Harpole reflect a "deliberate choice to follow a course of action" from "among various alternatives." *Pembaur*, 475 U.S. at 483. Flynn and Harpole had options for responding to the mourning and protest in Sherman Park without violating individuals' constitutional rights—but they chose not to take them. In fact, Flynn and Harpole could have continued the approach they took prior to August 30, making occasional arrests and regularly communicating with their command staff, community and religious leaders, and elected officials, and even citizens of the area regarding the gatherings that were occurring nightly during that period of time. (PFOF ¶¶ 10, 11, 18.) Both had directed various operations on the nights prior to August 30, without impinging indiscriminately on the rights of assembly and expression, but grew weary of the persistence of the mourners and protestors. (PFOF ¶ 12.) They could have continued with those operations or stepped up arrests of individuals engaged in disorderly conduct, without adopting the wholesale disperse and arrest approach they did on August 30. Because Flynn and

28

Harpole had alternatives, the City is liable for the premeditated decisions that led to Plaintiffs' unlawful arrests.

Flynn's and Harpole's decisions to authorize the indiscriminate arrest of any person failing to heed a dispersal order directly led to the constitutional violations of Plaintiffs' rights. Flynn's order and Harpole's operation to "take back the neighborhood" resulted in the violations of First and Fourth Amendment rights of individuals engaging in protected expressive and associational activity. Flynn's and Harpole's decision and operationalization of that decision directly led Defendants Rodriguez, Ghassoul, Brock, LaRoque, and Wilkiewicz to arrest Plaintiffs.

## CONCLUSION

For these reasons, Plaintiffs request that this Court grant their motion for partial summary judgment, finding Defendants liable for violating their First and Fourth Amendment rights and set the matter for trial on remaining issues.

Dated this 21st day of December, 2020.

By:    /s/ A. Steven Porter
       A. Steven Porter
       State Bar No. 1000195
       Attorney for Plaintiffs

P.O. Box 7093
Madison, Wisconsin 53707
(608) 662-2285
(608) 819-6466 (fax)
asp5949@gmail.com

AMERICAN CIVIL LIBERTIES UNION OF
WISCONSIN FOUNDATION, INC.
By:    /s/ Laurence J. Dupuis
       Asma Kadri Keeler
       State Bar No. 1114761
       R. Timothy Muth
       State Bar No. 1010710

29

Emma Shakeshaft
State Bar No. 1092046
Laurence J. Dupuis
State Bar No. 1029261
Attorneys for Plaintiffs

207 E. Buffalo Street, Room 325
Milwaukee, Wisconsin 53202
(414) 272-4032
(414) 272-0182 (fax)
akadri@aclu-wi.org
ldupuis@aclu-wi.org