UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JARRETT ENGLISH,
BENETRIA MCGOWAN,

        Plaintiffs,

                                        Case No. 19-cv-0781-bhl

    v.

CITY OF MILWAUKEE, et al.,

        Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

On August 13, 2016, a City of Milwaukee police officer fatally shot Sylville Smith, leading to a wave of protests that made national headlines. *See, e.g.*, Kay Nolan and Niraj Chokshi, *Milwaukee Shaken by Eruption of Violence After Shooting by Police*, N.Y. TIMES (Aug. 14, 2016), https://www.nytimes.com/2016/08/15/us/milwaukee-shaken-by-eruption-of-violence-after-shooting-by-police.html; ECF No. 80 at 2–3. In the initial days of these protests, a handful of those gathered engaged in reprehensible acts of criminal violence, including looting and the arson of a gas station and bank. ECF No. 80 at 2–4. But a majority of the protesters, including those meeting daily near a tree decorated as a memorial, were law-abiding and peaceful. *Id.* at 3–4. And, as passions cooled in the ensuing days, large-scale illegal activity subsided. *Id.* at 3–5. The situation did not become easy for the police, however. Neighborhood residents continued to report public drinking, drug use, and other disorderly behavior, sometimes lasting late into the night. *See, e.g.*, ECF No. 69-10 at 12–13; ECF No. 69-14 at 16–18. In response to these concerns, Milwaukee Police Chief Ed Flynn decided it was time to "restore order" to the area. ECF No. 69-3 at 3; ECF No. 69-27. Internal emails show he took it upon himself to determine that two weeks of mourning was "enough," and he instructed his units to put an end to the gatherings. ECF No. 69-6.

Caught up in Chief Flynn's decision were Plaintiffs Benetria McGowan and Jarrett English. Both were arrested in the vicinity of the memorial tree by officers acting on Chief Flynn's orders.

ECF No. 80 at 14–26. Neither was engaged in any criminal conduct; they simply happened to be in the area when the dispersal orders were issued and were deemed to be noncompliant. Following their arrests, they filed this lawsuit. ECF No. 1. Their amended complaint invokes 42 U.S.C. §1983 to assert Fourth Amendment claims for unlawful arrest (Count I) and excessive force (Count II) against the officers who were involved in their arrests—Raymond Brock, Nesrodene Ghassoul, Andrew Wilkiewicz, Rebecca Wallich (formerly Rebecca Rodriguez), and Assistant Chief of Police James Harpole.[1] ECF No. 20 at 3–5, 10–11. They also assert a First Amendment *Monell* claim against the City of Milwaukee, its Chief of Police (now Alfonso Morales), and Asst. Chief Harpole, challenging the City's decision to order the dispersal of all, even peaceful, protesters (Count III). *Id.* at 3–5, 11.

The parties have filed cross-motions for summary judgment. McGowan and English seek summary judgment on their wrongful-arrest and excessive-force claims and on one of their two theories of *Monell* liability. ECF No. 51. Defendants argue that the undisputed facts preclude liability findings on all the three counts. ECF No. 57. The individual officer defendants also assert qualified immunity. ECF No. 58 at 3. The Court heard oral argument on February 25, 2022 and took the motions under advisement. *See* ECF No. 96. For the reasons stated below, the motions are now granted in part and denied in part.

## FACTUAL BACKGROUND

### A. Violent Protests Follow the Police Shooting of Sylville Smith.

On the afternoon of August 13, 2016, Milwaukee Police Officer Dominique Heaggan-Brown shot and killed Sylville Smith in Milwaukee's Sherman Park neighborhood. ECF No. 20 at 5; ECF No. 69-9 at 18; *see also* Mitch Smith and Richard Pérez-Peña, *Milwaukee Officer Charged in Shooting That Set Off Riots*, N.Y. TIMES (Dec. 15, 2016), https://www.nytimes.com/2016/12/15/us/sylville-smith-milwaukee-police-shooting-dominique-heaggan-brown.html. The area was soon beset with major protests, some of which became violent. Nearly a thousand protesters gathered at the shooting site on the first night, and, according to one officer, a small number (about 35) were "agitated," shouting profanities at officers, inciting the crowd, and/or trying to enter the scene of the shooting. ECF No. 69-9 at 20. Protesters set fire to a gas station, a bank, and a police vehicle. ECF No. 20 at 5; ECF No. 64 at 2; ECF No. 69-10 at

---

[1] The Amended Complaint also names Officers Wade Grubich and Brian LaRoque as defendants, ECF No. 20 at 3–4, but all claims against them have been dismissed. ECF Nos. 47, 48, 96.

11; ECF No. 69-14 at 15; ECF No. 69-15 at 35. They also destroyed several bus shelters. ECF No. 69-14 at 15. Others looted and rioted. ECF No. 69-13 at 7–8; ECF No. 69-14 at 15.

The violence was not limited to attacks on property. Protesters threw bricks, rocks, and bottles at police. ECF No. 59-11 at 9; ECF No. 64 at 2; ECF No. 69-13 at 7. One threw a brick through a squad car windshield, significantly injuring an officer. ECF No. 64 at 2. Gunshots were also reported, ECF No. 69-10 at 11, with a bullet striking one officer's helmet. *Id.* While most shots were merely fired into the air, ECF No. 75 at 9–10 (citing ECF No. 69-10 at 11), at least one person suffered a non-fatal injury when a stray bullet struck him in the neck. ECF No. 59-2; ECF No. 69-15 at 33–35; ECF No. 75 at 10.

### B. Protests Continue with Lower Levels of Lawlessness.

As time passed, the gatherings continued but in smaller numbers. ECF No. 75 at 8. The level of violence also seemed to diminish. *See* 69-10 at 11. The extent of this diminishment is disputed, however, with the parties offering dramatically different characterizations of just how peaceful the situation was after August 13.

Plaintiffs maintain that violence and criminal activity tailed off almost entirely after the first few days. ECF No. 75 at 8–11; ECF No. 80 at 3. They describe dwindling crowds, with a dozen people gathering during the day and only slightly larger groups coming together at night. ECF No. 69-9 at 32; ECF No. 69-10 at 11; ECF No. 69-14 at 16; ECF No. 69-15 at 37; *but see* ECF No. 69-9 at 27 ("[T]here were some days we had dozens and dozens of people that would show up at the memorial."). They also emphasize that police made few arrests, as elected officials and community leaders facilitated expressive activity as an outlet for people's frustrations. ECF No. 80 at 5–8.

Defendants acknowledge that large-scale property damage and violence ceased after the first few days. ECF No. 80 at 3; *see also* ECF No. 69-14 at 16–17. But they insist that criminal activity did not end. They highlight ongoing disorderly conduct, which, they claim, sometimes escalated rapidly. *See, e.g.*, ECF No. 69-9 at 27, 32 ("[T]he daily congregation of disorderly people at that location wasn't abating."); ECF No. 58 at 30–31, 33–34; ECF No. 64 at 2; ECF No. 79 at 7–8, 11–12, 15–19, 26–27; ECF No. 85 at 6–9, 15. Residents reported profane language, public drinking and urination, marijuana use, and trespassing in private yards, porches, and parking spaces. ECF No. 69-10 at 12–13; ECF No. 69-14 at 16–18. Some objected that "their neighborhood was being taken over." ECF No. 69-14 at 16–18. Others, feeling intimidated by

the protesters, approached officers in private to ask when police would act. ECF No. 69-10 at 12–13. Residents also shared their concerns with local elected representatives, including Alderman Khalif Rainey. ECF No. 64 at 3; ECF No. 69-13 at 6–7; ECF No. 69-15 at 32; ECF No. 75 at 13.

### C. Police React by Deciding to Halt the Protests.

Against this backdrop, City officials began discussing ways to end the gatherings. On the morning of August 24, 2016, a member of Alderman Rainey's staff emailed several city officials, including Assistant Chief of Police James Harpole and Mayor Tom Barrett, expressing concerns about the area being "under siege" and citing an alleged shooting incident the preceding night. ECF No. 69-26. The email lauded the City's "soft hand" approach, noting its calming effect, but then cited a "need to change strategy" to find a way "to disperse *all* individuals" meeting in the area. *Id.* (emphasis added). It asked for "immediate solutions." *Id.*

Later that same day, Police Chief Ed Flynn emailed Mayor Barrett's chief of staff with a plan to end the protests. ECF No. 69-6. Flynn first described the "deteriorating conditions" and the police efforts to work with neighborhood residents to address their "frustration and annoyance." *Id.* He then laid out a strategy "to manage this group for the next couple of nights (unless their behavior bec[ame] intolerable) and not permit any return to the vigil on [August 26] after [Smith's] funeral and repast." *Id.* He pronounced that a "two week mourning period [would] be deemed enough at that location." *Id.* Plaintiffs characterize this statement as a preemptive fiat based on Chief Flynn's own weariness and impatience rather than the rule of law or the facts on the ground. *See* ECF No. 52 at 28–29 (citing ECF No. 69-27; ECF No. 80 at 5–12); ECF No. 74 at 17–19 (citing ECF No. 56-2, Ex. 1102 at 7:45–8:00; ECF No. 80 at 20–21); ECF No. 80 at 6–8.

Nearly a week later, on Tuesday, August 30, Alderman Rainey's staff again emailed Chief Flynn. ECF No. 69-27 at 1–2. The email asked for "an immediate resol[ution] to the current situation" given "numerous calls from concerned neighbors about . . . increased loitering, littering, drug use, drug sales and everyday disrespecting of the neighborhood." *Id.* Chief Flynn forwarded the email to Asst. Chief Harpole and instructed him to provide "patrol special attention" to the memorial location with officers giving "extra checks" to the area. ECF No. 69-27 at 1; ECF No. 80 at 7. While expressing hope that "admonishment and warnings" would be sufficient, Flynn directed that if "disorderly and criminal behavior persist[ed], or if lawful directives [were] defied, it [was] expected that enforcement actions [would] be taken[,] including the issuance of citations

and, when necessary, arrests." ECF No. 69-27 at 1. The "directive" was "to take effect immediately." *Id.*

Asst. Chief Harpole responded, saying, "I am going to pull the team together at 5:30 [p.m.] and discuss a strategic approach to our enforcement actions." *Id.* By 6:10 p.m., a radio bulletin called all available squads to a temporary command post at Capitol Drive and 56th Street. ECF No. 80 at 8–9. During a briefing there, Asst. Chief Harpole and another officer, Lieutenant Derrick Harris, instructed officers to ask the gatherers at the memorial site to leave, and to make arrests if individuals refused to do so. *Id.* at 9–14.

The details and implementation of these instructions are disputed. Asst. Chief Harpole testified he told officers to make arrests only if they "had probable cause to believe that [individuals] violated municipal ordinances or state statutes." ECF No. 61 at 4–5; ECF No. 75 at 17. Lt. Harris testified he received and relayed the same instruction—that arrests could be made *only* on probable cause. ECF No. 62 at 4. But other evidence suggests officers were told to make arrests to bring an end to the protests even in the absence of criminal behavior. ECF No. 69-14 at 22. When asked what instructions she recalled receiving, Wallich answered, "To disperse the crowds. If the crowds weren't leaving, then you ask them once. And if they don't leave, then you place them under arrest." ECF No. 69-12 at 15. Officer Michael Connell's bodycam footage shows an officer briefing other officers as to how to handle the gatherers in the area: "A couple warnings: 'Be quiet,' 'Time to go home[.]' . . . And if they don't shut up just arrest 'em for D.C. (disorderly conduct)." ECF No. 1102 (7:45–8:00). During an internal investigation into alleged misconduct on the night of August 30, Brock reported his team's plan was to "place about two . . . subjects in custody for any group they were instructed to address." ECF No. 69-5 at 19. It is unclear if Brock received this "plan" from Asst. Chief Harpole, Lt. Harris, or someone else. *See id.*

Around 8:00 p.m., after the briefing at the command post, two officers proceeded to the memorial site. ECF No. 75 at 18; ECF No. 69-10 at 16. According to Plaintiffs, the scene the officers encountered was no less peaceful or manageable than any other night after the early days of rioting. ECF No. 52 at 28–29 (citing ECF No. 69-27; ECF No. 80 at 5–12); ECF No. 74 at 17–19 (citing ECF No. 56-2 1102 at 7:45–8:00; ECF No. 80 at 20–21). The officers announced Chief Flynn's dispersal order and instructed the 50–100 individuals present to leave. ECF No. 75 at 18; ECF No. 69-10 at 16. With assistance from church leaders and elected officials, most gatherers

voluntarily left within 15 minutes. ECF No. 75 at 19; ECF No. 69-10 at 19. Around 8:25 p.m., additional officers were called in to help disperse remaining individuals, some of whom became verbally aggressive and expressed a desire to remain at the site. ECF No. 75 at 19; ECF No. 64 at 4; ECF No. 69-2 at 5; ECF No. 69-10 at 19–20. After the officers made several arrests, the remaining individuals dispersed. ECF No. 75 at 19–20 (citing ECF No. 69-10 at 21–22); ECF No. 80 at 10–13. By 8:52 p.m., Asst. Chief Harpole had emailed other officers that "44 and Auer is clear, we own it." ECF No. 80 at 13; ECF No. 69-7.

Officers then divided into teams and "went mobile," traveling in vans to "hot spot" locations around the neighborhood where groups remained. ECF No. 75 at 20–22; ECF No. 80 at 13. One of these mobile teams, "Team Two," included defendant officers Brock, Wallich, Ghassoul, and Wilkiewicz. ECF No. 75 at 22. Body cameras captured many of their actions that evening. *See, e.g.*, ECF No. 56, Ex. 1101.

### D. Police Arrest McGowan and English.

Shortly before 9:00 p.m., Benetria McGowan was walking west on Burleigh Avenue, just west of Sherman Boulevard and on her way to a new job. ECF No. 20 at 8; ECF No. 80 at 14. McGowan contends she came to pray for healing and was not present when the police officers ordered gatherers to disperse from the memorial site. ECF No. 80 at 14. When she noticed officers on Auer Avenue, she decided to go to a relative's house a few blocks further west. *Id.* As she walked westward on the sidewalk on the north side of Burleigh Avenue, she encountered Officers Wallich and Ghassoul. *Id.* They and other officers from Team Two were redirecting traffic and trying to disperse a group of 20–50 people gathered in the street who were cursing at them. ECF No. 75 at 24–25.

McGowan's interactions with Wallich and Ghassoul were remarkably brief and are recorded on bodycam footage. *See, e.g.*, ECF No. 56-4, Ex. 1104 at 17:00–24:40. Initially, McGowan was walking alone, doing nothing improper or unlawful. ECF No. 80 at 14–15. Wallich nevertheless told her to leave and threatened arrest. ECF No. 56-4, Ex. 1104 at 17:05–17:35. McGowan asked why she should leave and which direction she should take to get to her destination. ECF No. 80 at 15. Ghassoul told her to "go around" and pointed eastward. ECF No. 75 at 28. Then, almost immediately, and *less than 30 seconds after the entire interaction had begun*, Wallich and Ghassoul arrested McGowan and flexi-cuffed her hands behind her back. ECF No. 80 at 14–16, 26; ECF No. 28 at 15–16; ECF No. 75 at 28–29. Officers put McGowan in a

police van, took her downtown for processing, and held her at the station for about two hours before finally releasing her with a disorderly conduct ticket. ECF No. 80 at 17. The ticket was later dismissed as mistakenly issued. *Id.* McGowan claims that as a result of the arrest, she never made it to her job, and was fired due in part to this absence. ECF No. 20 at 9.

That same night, Jarrett English was arrested in similar fashion. *See* ECF No. 56, Ex. 1101. English came to the intersection of Sherman Boulevard and Auer Avenue around 9:00 p.m. after learning of a large police presence at the memorial site. ECF No. 80 at 18. He worked for the American Civil Liberties Union (ACLU) and upon arriving joined a group that included several elected officials. *Id.* Like McGowan, English was not present at the memorial site when the police officers ordered gatherers to disperse. *Id.* at 19. Around 9:30 p.m., Lt. Harris reported hearing loud cursing from a group near where English was standing. ECF No. 75 at 32–33. The Lieutenant then radioed that "a group of subjects are gathering [at the northeast corner of Sherman and Auer]" and "[t]hey need to be advised they will need to be leaving." ECF No. 56-12 (dispatch audio); ECF No. 69-5 at 13. The audio said nothing about any criminal activity. ECF No. 56-12 (dispatch audio); ECF No. 69-5 at 13. Team Two responded to the call. ECF No. 80 at 21. Brock later admitted that "his team was not provided any information about the group cursing or causing any sort of disturbance." ECF No. 69-5 at 19; *see also id.* at 25. When they arrived at the northeast corner of Sherman and Auer, English was not engaged in any unlawful conduct. ECF No. 80 at 19. While officers reported an open bottle of alcohol on the roof of a vehicle near where he was standing, they admit they had no reason to believe it belonged to him. *Id.* at 25.

Brock, Wilkiewicz, and Ghassoul ordered the group to disperse. *Id.* at 22. Seeming to comply, English slowly walked away, while explaining that he worked for the ACLU. *Id.* at 23. Confusingly, only eight seconds after telling the group to leave, the officers changed course and ordered everyone to place their hands on a parked car. *Id.* at 22. Brock then gave an abrupt order to take two of the individuals into custody. ECF No. 80 at 23; ECF No. 56-1, Ex. 1101 at 4:18– 4:22 ("Grab two of 'em. Grab *him* [and] grab *him*."). In response, Brock, Wilkiewicz, and Ghassoul arrested English and forced him to the ground where they flexi-cuffed and searched him. ECF No. 80 at 24. The officers told English he was being arrested for disorderly conduct. *Id.* They also arrested another member of English's group, Wisconsin State Representative Jonathan Brostoff. *Id.*

The officers detained English in a police vehicle for about 20 minutes with his hands flexi-cuffed behind his back. ECF No. 20 at 8; ECF No. 80 at 24–25. On learning they had arrested a state legislator, the officers released both him (Brostoff) and English. ECF No. 80 at 25. A non-defendant officer told the two, "Well, the bottom line is that sometimes misunderstandings happen, we understand that, so we're [going to] go ahead and . . . [,] you know, count this up as a misunderstanding." *Id.*

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Anderson*, 477 U.S. at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Anderson*, 477 U.S. at 248.

The moving party bears the burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To survive a properly supported summary judgment motion, the opposing party must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

This case exists at the intersection of two important public interests: (1) the need for police officers to secure public order and safety; and (2) the rights of individuals to be present in public spaces and express themselves. Plaintiffs insist Defendants sacrificed the latter in an unconstitutional attempt to advance the former. Defendants argue otherwise. Because the factual record remains disputed in material aspects, summary judgment is inappropriate on most of Plaintiffs' claims.

## I. Factual Disputes Preclude Summary Judgment on Plaintiffs' Wrongful Arrest Claims.

In Count I of the Amended Complaint, McGowan and English assert Fourth Amendment wrongful arrest claims against the individual police officers who detained them.[2] The lawfulness of these arrests turns on the issue of probable cause. If the officers had probable cause to arrest them, Plaintiffs' claims fail. *See Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014) (citing *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008)).

Whether a police officer has probable cause to arrest depends on what the officer saw and heard, and the facts known to him or her at the time of arrest. *See Tebbens v. Mushol*, 692 F.3d 807, 816 (7th Cir. 2012). The relevant inquiry is whether at the time of the arrest, the "facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). At the same time, an officer cannot close his eyes to information that cuts against probable cause. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 718 (7th Cir. 2013) (citing *Fox v. Hayes*, 600 F.3d 819, 834 (7th Cir. 2010)). The Court must consider the totality of the circumstances known to the officers and not focus on a small part of the overall picture. *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). Given the context-driven nature of the inquiry, probable cause is found as a matter of law "only when the facts permit but one conclusion—that is, 'only when no reasonable jury could find that the officer did not have probable cause' to make an arrest." *Jones ex rel. Jones v. Webb*, 45 F.3d 178, 182 (7th Cir. 1995) (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993)).

### A. The Officers Lacked Probable Cause to Arrest English for Public Drinking, Disorderly Conduct, or Loitering.

Defendants first seek to justify English's arrest on grounds they had probable cause to believe he was engaging in three relatively minor crimes: (1) disorderly conduct, (2) public drinking, and (3) loitering. ECF No. 58 at 28–30, 32–33. English insists the officers lacked the individualized probable cause necessary to justify arresting him for any of these offenses. ECF No. 52 at 16–22. The Court agrees with English.

---

[2] McGowan asserts claims against Defendants Ghassoul, Wallich, and Harpole; English sues Defendants Brock, Ghassoul, Wilkiewicz, and Harpole. *See* ECF No. 20 at 3–5, 10–11; ECF No. 52 at 1 n. 1.

There is no such thing as collective probable cause or guilt by association. The Supreme Court has long confirmed that probable cause must be particularized to the individual being arrested. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). That someone nearby may have committed a crime does not allow police officers to arrest anyone in the area. *United States v. Ellis*, 499 F.3d 686, 691 (7th Cir. 2007) (citing *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003)). This fundamental constitutional precept defeats Defendants' disorderly conduct argument. ECF No. 58 at 32–33.

Wisconsin's disorderly conduct statute makes it a Class B misdemeanor for a person to engage "in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance." Wis. Stat. §947.01. Defendants offer no evidence that English was engaged in any such behavior. Indeed, the various videos of his arrest confirm the opposite; he was calm and compliant. *See* ECF No. 56-1; ECF No. 56-6; ECF No. 56-9 at 0:50–4:00.

Defendants' reflexive invocation of the "collective knowledge doctrine" does not help them. This doctrine allows an officer to make an arrest, even in the absence of firsthand knowledge of facts supporting probable cause, if the officer is directed to do so by another officer who has such firsthand knowledge. *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (citing *United States v. Hensley*, 469 U.S. 221, 232–33 (1985); *United States v. Harris*, 585 F.3d 394, 400 (7th Cir. 2009)). Defendants claim they reasonably relied on Lieutenant Derrick Harris's report to arrest English. ECF No. 58 at 32–33. But Harris did not report that English was acting disorderly or committing any other crime. *See* ECF No. 56-12, Ex. 1112; ECF No. 69-5 at 19, 25. Harris merely believed that one or more individuals in a group were speaking and/or cursing loudly. ECF No. 80 at 20. And Harris did not relay even this limited information to the arresting officers. *Id.* His radio report was simply that a group had gathered and needed to be told to leave. *Id.* There is no evidence in the record that would support a reasonable belief that English was disorderly, whether based on the collective knowledge doctrine or otherwise.

Defendants' invocation of a city ordinance against public drinking and possession of alcoholic beverages (City Ordinance 106-1.8) likewise fails to supply legitimate grounds for an arrest. *See* ECF No. 58 at 33. The ordinance makes it "unlawful for any person [on a street within the limits of the city] to consume any alcoholic beverage or possess on his or her person, any bottle or receptable containing alcohol beverages if the bottle has been opened, the seal broken or the

contents of the bottle or receptacle have been partially removed[.]" ECF No. 59-13 at 2. Defendants argue that Brock observed "8–10 people who appeared to be loitering in and around two cars, and a bottle of liquor on top of one of those cars." ECF No. 58 at 33. But again, being near others who are "suspected of criminal activity does not, without more, give rise to probable cause for an arrest." *Ybarra*, 444 U.S. at 91; *Ellis*, 499 F.3d at 691. Defendants offer no evidence that the arresting officers had reason to believe English violated the statute. There is no evidence he drank from, possessed, or had anything whatsoever to do with the bottle of liquor the officers saw.

Defendants' attempt to justify English's arrest on loitering grounds fails for similar reasons. As stated above, Defendants contend that Brock observed "8–10 people who appeared to be loitering in and around two cars." ECF No. 58 at 33. Milwaukee's loitering ordinance (City Ordinance 106-31) makes it a violation for a person to "[l]oiter[] or prowl[] in a place, at a time, or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity." ECF No. 59-13 at 3. The ordinance further provides that "[u]nless flight by the actor or other circumstances makes it impracticable, a peace officer shall prior to any arrest for an offense under this section, afford the actor an opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and explain his presence and conduct." *Id.* There is no evidence that English was loitering in a place and manner unusual for law-abiding citizens under the circumstances; people had been gathering in this same area for the preceding two weeks. And Defendants did not give English or the others in his group a chance to explain who they were and why they were there, as the ordinance requires. Instead, they gave contradictory instructions to leave and to put their hands on a car (which they could only do by not leaving). Officers then arrested English as he was trying to walk away, in compliance with the first if not the second directive he received. The evidence precludes any reasonable belief there was probable cause to arrest English for loitering.

**B. Whether Defendants Had Probable Cause to Arrest McGowan or English for Obstructing an Officer Cannot Be Resolved on Summary Judgment.**

Defendants' only remaining justification for arresting English, and their sole basis for arresting McGowan, is for *obstruction* of police officers in violation of Wis. Stat. §946.41. ECF No. 58 at 30–34; ECF No. 85 at 5–10. Under this statute, "whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor." Wis. Stat. §946.41(1). A violation requires proof that: (1) the

defendant resisted or obstructed an officer; (2) the officer was acting in an official capacity; (3) the officer was acting with lawful authority; and (4) the defendant knew the officer was acting in an official capacity and with lawful authority and that the defendant's conduct would resist the officer. *See State v. Young*, 717 N.W.2d 729, 749 (Wis. 2006); Wis JI—Criminal 1765. At least two factual issues preclude the Court from deciding at summary judgment whether Defendants had probable cause to arrest McGowan or English for obstructing an officer.

### 1. The Court Cannot Rule As a Matter of Law on the Propriety of the Officers' Dispersal Orders.

Under Wisconsin law, the lawfulness of McGowan's and English's arrests depends on whether the arresting officers acted with "lawful authority" when they ordered them to disperse. *See Young*, 717 N.W.2d at 749. The Court agrees with McGowan and English that this is a "central question in this case." ECF No. 82 at 8.

In a free society, police officers do not have plenary authority to order citizens to "move on" or disperse. *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965). The Supreme Court has long held that the government may not condition a person's right to stand on a public sidewalk "on the whim of any police officer of that city." *Shuttlesworth*, 382 U.S. at 90; *see also State v. Werstein*, 211 N.W.2d 437, 440 (Wis. 1973) ("[T]o hold without limitation that any violation of a police command, whether or not lawful, constitutes disorderly conduct would be patently violative of the Fourteenth Amendment."). To the contrary, the Due Process Clause protects both the "the freedom to loiter for innocent purposes," *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999), and the freedom to walk down the street. *Morales*, 527 U.S. at 53; *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). Moreover, the First Amendment protects a person's right to peaceably assemble on a public sidewalk. *United States v. Grace*, 461 U.S. 171, 177 (1983) (confirming that streets, sidewalks and parks are "public forums" where the government's ability to permissibly restrict expressive conduct is "very limited"); *Grayned v. City of Rockford*, 408 U.S. 104, 116–17 (1972) (same).

But these rights are not unqualified. When there is "immediate danger" to speakers and protesters, police officers may order dispersal, and even curtail First Amendment rights, if necessary to "prevent a riot or serious bodily injury to those gathered." *Bell v. Keating*, 697 F.3d 445, 457 (7th Cir. 2012) (citing *Feiner v. New York*, 340 U.S. 315, 321 (1951); *Terminiello v. City of Chicago*, 337 U.S. 1, 4–5 (1949)). "[S]uch conditions . . . bespeak dispersal as a necessary means of averting danger and damage, and the City may empower law enforcement to order people

to disperse without unconstitutionally burdening free speech." *Id.* at 457. In these conditions, officers can arrest individuals who refuse to leave when ordered, "as their failure to comply exacerbates the danger afflicting the City and hinders law enforcement's ability to secure the situation." *Id.* (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

Citing *Shuttlesworth*, McGowan and English argue the officers lacked authority to order them to disperse. ECF No. 74 at 9–10. They highlight that neither of them was acting unlawfully and, in fact, both were engaging in protected activity—exercising their First Amendment rights to pray, protest, observe other protesters, observe police officers, and/or speak to police officers. ECF No. 52 at 10–16, 17–22, 27–29; ECF No. 74 at 9–13, 16–19, 30; ECF No. 82 at 3–5, 6–8, 10–13. Defendants, on the other hand, argue that the perceived volatility, dangerousness, and unpredictability of the situation justified the dispersal orders and enabled officers to arrest anyone who did not immediately leave. ECF No. 58 at 30–31; *see also id.* at 33–34, 44–45; ECF No. 79 at 7–8, 11–12, 15–19, 26–27; ECF No. 85 at 6–9, 15.

The dispositive question is thus whether officers reasonably believed the situation in Sherman Park on August 30 involved sufficient "immediate danger" to warrant the sweeping dispersal actions they carried out. *See Bell*, 697 F.3d at 457. A decade ago, the Seventh Circuit addressed a similar situation in a case involving an Iraq war protest in downtown Chicago. In *Vodak v. City of Chicago*, about 8,000 marchers, some of whom had become rowdy and started banging on cars, took an unexpected turn off a planned parade route. 639 F.3d 738, 741–44 (7th Cir. 2011). Police officers, perceiving themselves to be outnumbered and concerned in part with the potential blockage of rush hour traffic, ordered marchers to turn around or disperse, or else they would be arrested. *Id.* The Seventh Circuit held that, "[considering] the confused and alarming circumstances [involved in the march] . . . , the authority of the police to order the crowd to disperse and return to its starting point cannot be questioned." *Id.* at 743. Officers could arrest even peaceful demonstrators who defied the commands to leave. *See id.* at 745.

It is not clear that the circumstances in Sherman Park *on August 30* resembled the "immediate danger" in *Bell*, 697 F.3d at 457 or the "confused and alarming circumstances" in *Vodak*, 639 F.3d at 743. Defendants highlight the rioting that took place weeks earlier, on August 13, and the subsequent complaints of ongoing public drinking, public urination, drug use, street congestion, loud music, gambling, and littering. *See, e.g.*, ECF No. 75 at 9. They also note that residents felt besieged and the neighborhood's atmosphere remained volatile. *See, e.g.*, ECF No.

58 at 30–31; ECF No. 79 at 7–8, 18. Plaintiffs, on the other hand, insist that by the night of the arrests the situation in Sherman Park had become calm and there was no imminent danger that would justify the arrests. They depict a scene of law-abiding citizens gathering around a memorial, with a few bad actors in the area who were, at worst, committing non-violent misdemeanors and ordinance violations. *See, e.g.*, ECF No. 80 at 3. They insist the situation was no more volatile than the preceding nights and argue this cuts against any alleged urgency or imminent danger. *See, e.g.*, ECF No. 52 at 28–29.

As Defendants' counsel conceded at oral argument, the parties' competing characterizations of the situation preclude resolution of this issue as a matter of law. ECF No. 96. If Defendants are believed, the situation was fraught with chaos and danger, necessitating orders for immediate dispersal and justifying arrests when compliance did not follow. *See* ECF No. 58 at 33–34, 44–45; ECF No. 79 at 11–12, 15–19, 26–27; ECF No. 85 at 6–9, 15. If Plaintiffs' portrayal is accepted, the dispersal orders and arrests were not necessary and happened simply because Chief Flynn wanted the gatherings to end, having concluded unilaterally that two weeks of mourning was enough. *See* ECF No. 52 at 28–29; ECF No. 82 at 10–13 (citing ECF No. 80 at 6–9). Which of these versions of the facts is correct is for a jury to decide after hearing the conflicting evidence.

As a final matter, the Court notes that officers had an alternative avenue for balancing mourners' rights against neighbors' legitimate expectations for a return to peace and quiet. The law allows municipalities and police officers to use reasonable time, place, or manner regulations to limit and disperse gatherings. *See McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also Cox v. Louisiana*, 379 U.S. 536, 551–52 (1965) ("It is . . . undisputed that appropriate, limited discretion, under properly drawn statutes, or ordinances, concerning the time, place, duration, or manner of use of the streets for public assemblies may be vested in administrative officials, provided that such limited discretion is exercised with uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination and with a systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways.") (internal quotations omitted); *Vodak*, 639 F.3d 738, 749 (7th Cir. 2011) (same). But Defendants do not appear to have approached the situation from that perspective. They cite no noise level ordinance, curfew announcement, or similar legal basis for a legitimate time, place, or

manner dispersal. Nor have they presented or developed any summary judgment argument under this type of theory. Accordingly, at least for purposes of summary judgment, this justification has been waived. *See Zember v. Ethicon, Inc.*, No. 20-CV-369-JPS, 2021 WL 1087041, at *3 (E.D. Wis. Mar. 22, 2021) (citing *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014)) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

### 2. It Is Unclear Whether Plaintiffs' Failures to Comply Immediately with Officers' Orders Obstructed the Officers' Legitimate Law Enforcement Efforts.

Even if the dispersal orders were lawful and valid, the officers would still have needed probable cause to believe McGowan and English materially "resisted or obstructed" them as they were carrying out those orders. Wis. Stat. §946.41; *see also Young*, 717 N.W.2d at 749. Under Wisconsin obstruction law, "[t]he action justifying an arrest for obstruction cannot simply 'inconvenience' the official; the action must make a difference in an official's ability to perform an official act." *Henes v. Morrissey*, 533 N.W.2d 802, 808 (Wis. 1995) (citing *State v. Hamilton*, 356 N.W.2d 169, 174–75 (Wis. 1984)).

Defendants point to evidence that both McGowan and English failed to comply with arresting officers' instructions to disperse and then insist these refusals justified arrests for obstruction. It is undisputed that officers Wallich and Ghassoul told McGowan to leave the area and warned her she would be arrested if she did not comply. ECF No. 56-4, Ex. 1104 at 17:00– 18:30. It is also undisputed that officers gave similar orders to English, along with others in his group. ECF No. 80 at 38–40. But the factual record of Defendants' contemporaneous motives and whether McGowan and English were truly inhibiting the officers' ability to maintain order is far from undisputed. There is substantial evidence suggesting the officers (and their superiors) had decided to make arrests even before they encountered McGowan and English, irrespective of any actual interference with the officers' ability to do their jobs. *See id.* at 22. For example, an internal investigation report indicates "[the officers'] plan [was] to place about two . . . subjects in custody for any group they were instructed to address." ECF No. 69-5 at 19; *see also* ECF No. 69-12 at 15. Still other evidence suggests obstruction became a post hoc rationale for arrests initially made on the basis of disorderly conduct (itself perhaps a specious basis). McGowan's contemporaneous citation was for disorderly conduct, not obstruction. ECF No. 80 at 17. And in her 30-second interaction with officers before being arrested, McGowan did not attempt to push her way past the officers, nor did she leave in a different direction than instructed. *See, e.g., id.* at

14–16. Similarly, while someone in English's vicinity may have been drinking in public and using profanities, there is no evidence English himself was doing so. *See* ECF No. 58 at 32–33. The contemporaneous bodycam footage does not show any conduct that would appear likely to make any difference in officers' performance of an official act. *See* ECF No. 56-4, Ex. 1104 at 17:00–24:40 (McGowan); ECF No. 56, Ex. 1101 (English).

In the end, the facts are sufficient to create a genuine dispute about whether either plaintiff's alleged disobedience to the officers' orders made a difference in their ability to do their jobs properly. A reasonable jury could find that the failure of McGowan and English to comply immediately (within seconds) of being ordered to disperse caused, at most, a mere inconvenience to the officers, who are now just trying to rationalize a pre-ordained decision. *See Henes*, 533 N.W.2d at 808. Accordingly, this is an issue for a finder of fact, not the Court.

### C. Summary Judgment on the Wrongful Arrest Claims Is Also Inappropriate As to Asst. Chief Harpole.

Defendants separately seek summary judgment on the claims against Asst. Chief Harpole. ECF No. 58 at 24–28. They point out that liability under Section 1983 requires personal involvement and argue Harpole is entitled to summary judgment because he was not "personally engaged in any unconstitutional conduct" and did not observe, approve, condone, or turn a blind eye toward any such conduct. *Id.* at 25–27.

Defendants are correct that Section 1983 liability requires personal involvement. *See Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). There is no respondeat superior under Section 1983. *See Vodak*, 639 F.3d at 747 (citing *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992)). "In order for a supervisor to be liable [for a Section 1983 claim], [he] must be personally responsible for the deprivation of the constitutional right." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (citations omitted).

Plaintiffs concede that Asst. Chief Harpole did not carry out the actual arrests, but argue he still faces liability because he personally "direct[ed] an operation whose purpose was to indiscriminately disperse assemblies and arrest people who did not immediately disperse, without individualized probable cause to believe those individuals had committed any crime." ECF No. 74 at 24–26. This latter point is sufficient to defeat summary judgment.

During the incidents of August 30, Asst. Chief Harpole was acting in a supervisory capacity. ECF No. 80 at 7–13. The record shows Harpole played some role in ordering the August 30 dispersal action, *see* ECF No. 69-27 at 1, and he had some involvement, at least, in Plaintiffs'

arrests. There is evidence suggesting that Harpole let it be known that officers were to carry out a broad dispersal action, with a predetermined intent of making arrests even in the absence of probable cause. *See, e.g.*, ECF No. 69-12 at 15. Whether Harpole personally facilitated Section 1983 violations is therefore not a question that can be answered at summary judgment. Both parties' motions for summary judgment on Plaintiffs' claims against Harpole must therefore be denied.

### D. Defendants' Qualified Immunity Defense Is Insufficient for the Court to Grant Summary Judgment to Defendants on Plaintiffs' Wrongful Arrest Claims.

Defendants next insist they are also entitled to summary judgment on the wrongful arrest claims because of qualified immunity. "A public official is entitled to qualified immunity from suit unless he violated a clearly established constitutional right." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "An officer 'is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, a reasonable officer could have mistakenly believed that probable cause existed.'" *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir.1998); citing *Reher v. Vivo*, 656 F.3d 772, 777 (7th Cir. 2011)).

"Qualified-immunity analysis usually entails a two-step inquiry: we ask (1) whether the facts alleged or shown by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Dockery*, 911 F.3d at 466 (citing *Pearson v. Callahan*, 555 U.S. 223, 232, (2009)). "To show that a right is clearly established, the plaintiff must demonstrate that existing caselaw at the time of the events in question 'placed the statutory or constitutional question beyond debate.'" *Id.* at 466 (citing *Ashcroft*, 563 U.S. at 741). "Qualified immunity cannot be defeated simply by 'alleging [a] violation of extremely abstract rights.'" *Id.* (citing *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). "[T]o place the constitutional question beyond debate, the precedent must be 'particularized to the facts of the case.'" *Id.* "A plaintiff may also overcome an officer's qualified immunity by showing that the conduct in question is 'so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully.'" *Id.* at 466–67 (citing *Abbott*, 705 F.3d at 723–24).

In answering the first question, the Court must construe contested facts in Plaintiffs' favor. *E.E.O.C. v. Sears*, 233 F.3d at 437; *Hoeppner v. Billeb*, 17-cv-430-bbc, 2018 WL 5282898, at *11 (W.D. Wis. Oct. 24, 2018) (citing *Board v. Farnham*, 394 F.3d 469, 476 (7th Cir. 2005)) ("[E]ven

qualified immunity does not change the rule that facts must be construed in favor of the nonmoving party on a motion for summary judgment.").  The Court must therefore accept Plaintiffs' characterization that: (1) the scene on the night of August 30 in Sherman Park was largely peaceful and quiet, with only a few isolated and manageable criminal incidents occurring far away from McGowan and English; (2) the group McGowan was approaching was, at most, using foul language, being disrespectful to police officers, and temporarily standing in a street; (3) English's group was not in the street and included perhaps one person cursing loudly; (4) Team Two had no indication that either group was causing immediate danger; and (5) the officers acted on instructions to arrest anyone who did not disperse when ordered, regardless of probable cause.

With this view of the disputed facts, the Court cannot conclude that an officer could reasonably (even if mistakenly) believe that there was an immediate danger warranting dispersal orders.  Nor could they reasonably believe it was lawful to make arrests regardless of probable cause.  And, without this or any other justification, the officers would have arrested McGowan and English solely for failing to immediately disperse from a public space after being told to do so by police, despite the lack of any immediate danger.   Constitutional protection from such arrests has long been established by cases like *Shuttlesworth*.   382 U.S. at 90.   Defendants' qualified-immunity defense therefore fails based on the disputed facts.

## II.  Asst. Chief Harpole Is the Only Defendant Entitled to Summary Judgment on Plaintiffs' Excessive-Force Claims.

Count II of the Amended Complaint asserts excessive-force claims against the arresting officers (Wallich, Ghassoul, Brock, and Wilkiewicz) and Asst. Chief Harpole.   Whether an arresting officer's use of force violates the Fourth Amendment depends on whether the force employed was reasonable.  *Howell v. Smith*, 853 F.3d 892, 898 (7th Cir. 2017).

Courts evaluate the reasonableness of an officer's use of force based on "the totality of the circumstances," "balancing . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citing *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003); *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009)).  Courts consider a variety of factors, "including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Stainback*, 569 F.3d at 772).  Courts must also keep in mind the need for officers "to make split-second judgments

based on rapidly developing events." *Id.* (citing *Holmes v. Vill. of Hoffman Ests.*, 511 F.3d 673, 685 (7th Cir. 2007)).

**A. Plaintiffs' Request for Summary Judgment Fails Given the Disputed Facts Surrounding Their Arrests.**

Plaintiffs argue that if their arrests were unlawful, then any force used during the arrests was *per se* excessive. ECF No. 52 at 22–24; ECF No. 74 at 14–16; ECF No. 82 at 6. But the Court has concluded that factual disputes remain on whether their arrests were unlawful. Because that issue remains outstanding, the Court cannot grant summary judgment for McGowan and English on their excessive-force claims either.

**B. The Undisputed Facts Defeat Plaintiffs' Excessive-Force Claim Against Asst. Chief Harpole But Not Against the Other Officer Defendants.**

Defendants argue they are entitled to summary judgment because the arresting officers had the right to use a reasonable amount of force when arresting McGowan and English, and the totality of the circumstances shows their use of force was reasonable. ECF No. 58 at 35–37; ECF No. 79 at 19–22; ECF No. 85 at 10–11. They point to evidence that officers merely put McGowan's hands behind her back in order to bind them and contend this level of force was reasonable to effectuate her arrest as a matter of law. ECF No. 58 at 37. Similarly, Defendants concede that they brought English to the ground, but insist the facts show they did so in a controlled manner and only because he was defying orders to put his hands behind his back. *Id.* They also emphasize that neither arrestee was injured or complained of injury. *Id.*

Defendants' argument that these facts demonstrate the reasonable use of force as a matter of law cannot be reconciled with the Seventh Circuit's decision in *Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041 (7th Cir. 2002). In *Herzog*, the Court of Appeals reversed a district court's grant of summary judgment in favor of police officers in similar circumstances. The case involved a procedural concession by which defendants admitted plaintiffs' version of the facts were true and complete. Those conceded facts involved officers' use of force during an unlawful arrest when they "without provocation or excuse" forced a "middle-aged female plaintiff to the ground and . . . [then] refused to loosen [her] chafing handcuffs." *Id.* at 1043. The Seventh Circuit held these facts were sufficient for a jury to find the officers' use of force excessive. *Id.* at 1043–44.

While, unlike *Herzog*, Defendants here do not concede Plaintiffs' version of the facts, at summary judgment this Court must nevertheless read the factual record in the light most favorable to McGowan and English. *See E.E.O.C. v. Sears*, 233 F.3d at 437; *Board*, 394 F.3d at 476.

Accordingly, the Court must presume that the officers approached both McGowan or English on the night in question with the predetermined intention of ordering them to leave and arresting them even without probable cause. Then, in completing the arrests, the officers tightly flexi-cuffed McGowan and put her in a police van for hours, ECF No. 75 at 30, as a result of which McGowan now suffers from "lasting pain and numbness" in addition to "substantial emotional distress due to [feelings of] helplessness, humiliation, and fear." ECF No. 74 at 15–16. And officers similarly forced English's hands behind his back, pushed him to the ground, flexi-cuffed him, and placed him in a police van. ECF No. 75 at 49–51. English sustained some physical injuries, including soreness in his arms, and emotional distress, including "fear about where he would be taken and what would be done to him." ECF No. 74 at 15; ECF No. 75 at 54. With such a reading of the facts, Defendants' conduct falls squarely within the level of force the Seventh Circuit found in *Herzog* to be sufficient to defeat summary judgment on excessive-force claims.

Defendants stand on more solid ground in seeking summary judgment on the excessive-force claims against Asst. Chief Harpole. As with their challenge to Plaintiffs' wrongful arrest claims, Defendants insist Harpole cannot be liable because he lacked any personal involvement in the arresting officers' use of force against McGowan or English. *Id.* at 24–28. The Court agrees. The record confirms he was not present for either arrest and gave no orders concerning the use of force against either Plaintiff. Accordingly, he is entitled to summary judgment on the excessive-force claims against him. *See Matthews*, 675 F.3d at 708.

## C. The Arresting Officers' Qualified Immunity Defense Does Not Bar Plaintiffs' Excessive-Force Claims.

Defendants also seek summary judgment on the excessive-force claims based on qualified immunity. *Herzog* is dispositive of this defense too. 309 F.3d 1043–44; *see above*. When the Court construes disputed facts in their favor, McGowan's and English's claims fall directly within the particularized facts of *Herzog*, in which the Seventh Circuit noted, "If the facts are as alleged, a reasonable police officer in the position of these defendants would have known for sure that his actions violated the Constitution, and so the defendants cannot shelter behind the defense of official immunity." *Id.* at 1044.

## III. Neither Plaintiffs Nor Defendants Are Entitled to Summary Judgment on Plaintiffs' *Monell* Claim.

Count III of the Amended Complaint asserts a *Monell* claim against Chief Alfonso Morales and Asst. Chief Harpole (in their official capacities) and the City of Milwaukee. Through this

claim, McGowan and English challenge the City's alleged disperse-and-arrest policy, which they contend is used unconstitutionally to arrest peaceful protesters engaging in protected First Amendment activities. Plaintiffs seek an injunction against ongoing enforcement of the policy. ECF No. 20 at 1, 11.

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court recognized that municipalities could in limited circumstances be "persons" held liable for constitutional violations under Section 1983. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). *Monell* recognizes three primary ways to prove that a municipality itself inflicted harm. First, a plaintiff may show that the alleged unconstitutional conduct implements or executes an official policy adopted by the entity's officers. *Monell*, 436 U.S. at 690; *see also Glisson*, 849 F.3d at 379 (quoting *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35 (2010)). Second, one may show that the unconstitutional action was done pursuant to a custom— even one that is not formally codified. *Monell*, 436 U.S. at 690–91; *see also Glisson*, 849 F.3d at 379. Third, a plaintiff may prove that an actor with final decision-making authority within the entity adopted the relevant policy or custom. *Monell*, 436 U.S. at 694; *see also Vodak*, 639 at 747.

Plaintiffs offer two alternate *Monell* theories. With respect to the specific conduct in this case, McGowan and English argue that Chief Flynn and Asst. Chief Harpole were persons with final policymaking authority who adopted and carried out unlawful disperse-and-arrest actions. ECF No. 51 at 1; ECF No. 52 at 27–29. Alternatively, and more broadly, Plaintiffs contend the City of Milwaukee has adopted "a widespread practice or custom of using unlawful dispersal orders to suppress mass First Amendment activity." ECF No. 51 at 2; ECF No. 52 at 27 n. 10.

## A. Defendants' Challenge to Plaintiffs' *Monell* Claim Succeeds Only in Part.

Defendants primarily contend that because the undisputed facts preclude any finding of an underlying unlawful arrest, there can be no *Monell* liability either. ECF No. 58 at 40–46. *Id.* Given the Court's ruling on the underlying constitutional violations, this argument fails.

Defendants' better argument is that Plaintiffs' *Monell* claim fails because even if the officers engaged in unlawful disperse-and-arrest tactics in Sherman Park on August 30, 2016, there is no evidence this was part of a "widespread practice or custom" sufficient to support *Monell* liability. ECF No. 58 at 44–45; ECF No. 79 at 27. Defendants insist that McGowan and English proffer only a single incident—the August 30 arrests—and this one instance is insufficient evidence to establish a "widespread practice or custom" as a matter of law. ECF No. 58 at 44–45;

ECF No. 79 at 27. The Court agrees with Defendants that this portion of Plaintiffs' theory fails for lack of proof. "Although [the Seventh Circuit] has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice." *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) (citing *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (internal citations omitted)). Here, McGowan and English point to nothing beyond their own arrests on a single night. Under Seventh Circuit law, this is insufficient. *Wilson*, 742 F.3d at 780. Thus, Plaintiffs' attempt to impose *Monell* liability based on a theory of a widespread practice or custom fails.

Plaintiffs do not rely solely on the "widespread custom or practice" theory, however. Their alternate *Monell* theory is based on allegations that the City adopted an unconstitutional policy through the conduct of high-level actors—Chief Flynn and Asst. Chief Harpole—on August 30, 2016. ECF No. 52 at 27–29. A police superintendent or a chief of police can be considered a person with final policymaking authority when that person is "at the apex of authority for the action in question." *Vodak*, 639 F.3d at 748 (internal quotations omitted); *see also Congine v. Vill. of Crivitz*, 947 F. Supp. 2d 963, 974–76 (E.D. Wis. 2013). With respect to this theory, Plaintiffs have pointed to sufficient evidence to get past summary judgment. The record shows that Chief Flynn made the decision to carry out the disperse-and-arrest action in Sherman Park, and that Asst. Chief Harpole provided the "highest level of direct supervision" in operationalizing that decision. ECF No. 52 at 27–29 (citing ECF No. 69-3 at 3). Chief Flynn emailed Mayor Barrett's chief of staff that "[a] two week mourning period will be deemed enough," ECF No. 69-6, suggesting he intended even peaceful observers and passersby to be removed from Sherman Park. While the evidence is more conflicting concerning Harpole's instructions, officers may have believed they were to make random arrests of anyone who even hesitated to leave so that everyone would clear out. *See, e.g.*, ECF No. 69-5 at 19. Given this record, a reasonable jury could conclude that Flynn and Harpole enacted and executed a policy that caused constitutional violations. This is sufficient for a jury to impose *Monell* liability on the City.

Last, the Court agrees with Defendants that the *Monell* claims against Morales and Harpole in their official capacities should be dismissed. *See* ECF No. 58 at 27–28. These claims are purely redundant with the *Monell* claim against the City. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Tabor v. City of Chicago*, 10 F. Supp. 2d 988, 991 (N.D. Ill. 1998) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985) ("Plaintiff sues the [c]ity and the individual defendants in their

official capacities. . . . [C]ourts have routinely dismissed claims against municipal agents in such cases.")). Given the redundancy, and for purposes of simplifying the record, the Court will dismiss the official-capacity *Monell* claims against Chief Flynn and Asst. Chief Harpole. This dismissal is without prejudice and has no impact on Plaintiffs' remaining *Monell* claim against the City.

**B. Disputed Facts Preclude Plaintiffs' Request for Summary Judgment on Their *Monell* Claim.**

Plaintiffs move for summary judgment on their *Monell* claim, but only with respect to their theory that Flynn and Harpole adopted an unconstitutional policy. *See* ECF No. 52 at 27–29. (They seek a full trial on the second theory, that the City of Milwaukee engaged in a widespread custom or practice of unconstitutional dispersal actions.) But again, the undisputed facts do not establish whether McGowan and English were in fact unlawfully arrested. Accordingly, Plaintiffs' *Monell* theory must be resolved by a jury.

CONCLUSION

For the reasons given above,

**IT IS HEREBY ORDERED** that Plaintiffs' motion for summary judgment is **DENIED**. **IT IS FURTHER ORDERED** that Defendants' cross-motion for summary judgment is **GRANTED in part and DENIED in part**. Defendants' motion for summary judgment as to the Count II claim against Harpole and the Count III claim against Harpole and Morales is **GRANTED**. In all other respects, Defendants' motion is **DENIED**.

Dated at Milwaukee, Wisconsin on August 12, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge