# Exhibit C

## STIPULATED FACTS

1. On August 13, 2016, in the Sherman Park neighborhood of Milwaukee, a City of Milwaukee police officer shot and killed Sylville Smith, a Black man, who was fleeing after a traffic stop. (Defs' Response to Pls' PFOF (Dkt. 80) ¶ 1.) *See also* Order on Summ Judgment Motions (Dkt 97) at 1. ("On August 13, 2016, a City of Milwaukee police officer fatally shot Sylville Smith, leading to a wave of protests.")

2. In the initial days of these protests, a handful of those gathered engaged in reprehensible acts of criminal violence, including looting and the arson of a gas station and bank. (Dkt 97 at 1.)

3. Nearly a thousand protesters gathered at the shooting site on the first night, and, according to one officer, a small number (about 35) were "agitated," shouting profanities at officers, inciting the crowd, and/or trying to enter the scene of the shooting. Protesters set fire to a gas station, a bank, and a police vehicle, destroyed bus shelters, looted and rioted, throwing bricks, bottles and rocks at police, injuring one officer in a car, and fired shots in the air, striking one officer's helmet and injuring one person in the neck. (Dkt 97 at 2-3)

4. As passions cooled in the ensuing days, large-scale illegal activity subsided. (Dkt 97 at 1.)

5. Mourners and protesters created a memorial of balloons and other items on a street tree along West Auer Avenue between North Sherman Boulevard (equivalent to North 43rd Street) and North 44th Street, near the location of the shooting. (Dkt 80 ¶ 5)

6. This memorial became a daily gathering place for mourners and protesters (Dkt 80 ¶ 6.)

7. A majority of the protesters, including those meeting daily near a tree decorated as a memorial, were law-abiding and peaceful. (Dkt 97 at 1.) *See also* Dkt 80 ¶ 7 ("While there were some complaints from neighbors about noise, public drinking and other "disorderly" behavior by some people who came to the memorial in the evenings, other people who gathered did not engage in such behavior.")

8. Police made some arrests in the area, but generally allowed the mourning and protest at the memorial to continue. (Dkt 80 ¶ 10.)

9. A number of elected officials and other community leaders played a role in facilitating the expressive activity of those mourning and protesting, while also mediating conflicts with residents of the homes near the memorial, with the knowledge and consent of police command staff. (Dkt 80 ¶ 11.)

10. The situation did not become easy for the police or community residents of the Sherman Park neighborhood, however. Neighborhood residents continued to report public

Exhibit C

drinking, drug use, and other disorderly behavior, sometimes lasting late into the night. (Dkt 97 at 1.)

11. In response to these concerns and at Alderman Rainey's office's second request, Milwaukee Police Chief Ed Flynn decided it was time to "restore order" to the area. (Dkt 97 at 1.)

12. On the morning of August 24, 2016, a member of Alderman Rainey's staff emailed several city officials, including Assistant Chief of Police James Harpole and Mayor Tom Barrett, expressing concerns about the area being "under siege" and citing an alleged shooting incident the preceding night. The email lauded the City's "soft hand" approach, noting its calming effect, but then cited a "need to change strategy" to find a way "to disperse *all* individuals" meeting in the area. (Dkt 97 at 4.) *See also* Dkt 80 ¶ 13 ("[On August 24] a legislative assistant to Alderperson Khalif Rainey sent an email to a number of people, including Harpole, raising concerns about a shooting in the neighborhood the day before and stating, 'We now need to find a way to disperse all individuals from the 44th and Auer area.'")

13. Later that same day, Police Chief Ed Flynn emailed Mayor Barrett's chief of staff with a plan to end the protests. Flynn first described the "deteriorating conditions" and the police efforts to work with neighborhood residents to address their "frustration and annoyance." He then laid out a strategy "to manage this group for the next couple of nights (unless their behavior bec[ame] intolerable) and not permit any return to the vigil on [August 26] after [Smith's] funeral and repast." He pronounced that a "two week mourning period [would] be deemed enough at that location." (Dkt 97 at 4.) *See also* Dkt 80 ¶ 14 ("Harpole forwarded this email to Chief Flynn shortly before Flynn sent [an] email announcing [a] plan to not allow mourners to return to the memorial after the funeral for Sylville Smith.")

14. On Tuesday, August 30, Alderman Rainey's staff again emailed Chief Flynn. The email asked for "an immediate resol[ution] to the current situation" given "numerous calls from concerned neighbors about . . . increased loitering, littering, drug use, drug sales and everyday disrespecting of the neighborhood." Chief Flynn forwarded the email to Asst. Chief Harpole and instructed him to provide "patrol special attention" to the memorial location with officers giving "extra checks" to the area. While expressing hope that "admonishment and warnings" would be sufficient, Flynn directed that if "disorderly and criminal behavior persist[ed], or if lawful directives [were] defied, it [was] expected that enforcement actions [would] be taken[,] including the issuance of citations and, when necessary, arrests." The "directive" was "to take effect immediately." Asst. Chief Harpole responded, saying, "I am going to pull the team together at 5:30 [p.m.] and discuss a strategic approach to our enforcement actions." By 6:10 p.m., a radio bulletin called all available squads to a temporary command post at Capitol Drive and 56th Street. (Dkt 97 at 4-5.) *See also* Dkt 80 ¶ 15 ("On August 30, 2016, Alderperson Rainey's aide sent another email to Chief Flynn, this time noting complaints from neighbors and acknowledging that it was a "delicate process" to "be respectful to the individuals gathering and the residents," but ultimately asking that police "do what needs to be done

# Exhibit C

to restore this neighborhood to its originally glory.""); Dkt 80 ¶ 22 ("By 6:10 p.m., a "special assignment" bulletin went out over police radio calling all available squads to respond to a "command post" at Capitol Drive and 56th Street, where a briefing was held for responding officers."); Dkt 80 ¶ 27 ("The Internal Affairs investigator determined that the directive to disperse the crowd came from Assistant Chief Harpole.")

15. No dispute that the activity occurring in the area of the "memorial tree" on August 30, 2016 was similar to the activity which had occurred there every day and night during the preceding two weeks, and the primary trigger for the police response on the evening of August 30, 2016 was the communication received from Alderman Rainey and Mayor Barrett, which gave their approval for restoring order to the Sherman Park neighborhood. (Dkt 80 ¶ 20.)

16. Chief Flynn had final decision-making authority over the operation on August 30, 2020; he did not need permission from the Common Council or the Fire and Police Commission to issue the directive to restore order to the neighborhood. (Dkt 80 ¶ 17.)

17. As to operational planning, Defendant Harpole had the "highest level of direct supervision" regarding the deployment, with Inspector Basting making on-the ground decisions about its execution. (Dkt 80 ¶ 19.)

18. Defendant Harpole communicated with other command staff to quickly devise a plan to "restore order" that evening by "clear[ing] the area around the memorial" and "remov[ing] the individuals from the memorial at the tree." (Dkt 80 ¶ 21.)

19. Milwaukee Police quickly became aware the crowd had generally dispersed from the tree; however, groups of individuals were continuing to congregate in the neighborhood and general vicinity. (Dkt 62 ¶ 26 – 32.)

20. Defendants at all relevant times acted under color of law. (Email from C. Muche (6/13/2023))

21. Plaintiffs were "arrested" for purposes of the Fourth Amendment. (Email from C. Muche (6/13/2023))